# In the United States Court of Federal Claims

### No. 21-1202T
### Filed: August 23, 2022

```
* * * * * * * * * * * * * * * * **
STEPHANIE L. FLINT AND DAVID J.         *
JONES, AS EXECUTORS OF THE              *
ESTATE OF MARGARET J. JONES,            *
                                        *
        Plaintiffs,                     *
                                        *
v.                                      *
                                        *
UNITED STATES,                          *
                                        *
        Defendant.                      *
                                        *
* * * * * * * * * * * * * * * * **
```

**Patrick W. Martin**, Law Offices of Procopio, Cory, Hargreaves & Savitch LLP, San Diego, CA, for plaintiffs.

**Jason S. Selmont**, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C., for defendant. With him was **G. Robson Stewart**, Assistant Chief, Court of Federal Claims Section, **David I. Pincus**, Chief, Court of Federal Claims Section, and **David A. Hubbert**, Deputy Assistant Attorney General, Tax Division.

## O P I N I O N

<u>HORN, J.</u>

In the complaint filed in this court, plaintiffs Stephanie L. Flint and David J. Jones, as executors of the estate of Margaret J. Jones, assert two causes of action, "**COUNT I – BREACH OF CONTRACT**," and "**COUNT II – ILLEGAL EXACTION**." (capitalization and emphasis in original). For both alternative counts, in total plaintiffs seek $156,795.26, the amount paid by Mrs. Jones to the United States Internal Revenue Service (IRS) as a "Miscellaneous Offshore Penalty" (MOP), recovery of "pre and post-judgment interest as allowed by law," "attorneys' fees and all costs of suit," and "such other further relief as the Court may deem just and proper." Defendant filed a motion to dismiss Count One of plaintiffs' complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC) (2021) and to dismiss Count Two of plaintiffs' complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). The motion has been fully briefed and oral argument has been held.

# BACKGROUND

This case challenges the application of an IRS program, which, according to the IRS website, is available to United States taxpayers holding foreign accounts not previously disclosed to the IRS, in order to promote voluntary disclosure of those accounts and to resolve existing tax obligations, including certain penalties related to the previous failure to disclose those foreign accounts. In particular, the case currently before the court concerns the Streamlined Filing Compliance Procedures, also called just the Streamlined Procedures. While the Streamlined Procedures are detailed on the relevant pages of the IRS website, the Streamlined Procedures do not appear to be spelled out in statute or regulation, a fact which both parties confirmed at oral argument.[1]

The Streamlined Procedures, which are at issue in the current case, were first available in 2012 and, following a revision in 2014, remain in operation at the time of the issuance of this Opinion. According to the IRS website, the Streamlined Procedures:

> are available to taxpayers certifying that their failure to report foreign financial assets and pay all tax due in respect of those assets did not result from willful conduct on their part. The streamlined procedures are designed to provide to taxpayers in such situations with
>
> - a streamlined procedure for filing amended or delinquent returns, and
> - terms for resolving their tax and penalty procedure for filing amended or delinquent returns, and
> - terms for resolving their tax and penalty obligations.

Streamlined Filing Compliance Procedures, INTERNAL REVENUE SERVICE, https://www.irs.gov/individuals/international-taxpayers/streamlined-filing-compliance-procedures (last visited Aug. 23, 2022). To participate in the Streamlined Procedures, taxpayers must:

> certify, in accordance with the specific instructions set forth below, that the failure to report all income, pay all tax and submit all required information returns, including FBARs (FinCEN Form 114, previously Form TD F 90-

---

[1] A second program for foreign account disclosure, the Offshore Voluntary Disclosure Program (OVDP), also existed at the time the events giving rise to the case currently before the court occurred. The OVDP is not at issue in the case currently before the court, and was ended by the IRS in September 2018. See IRS to end offshore voluntary disclosure program; Taxpayers with undisclosed foreign assets urged to come forward now, INTERNAL REVENUE SERVICE, https://www.irs.gov/newsroom/irs-to-end-offshore-voluntary-disclosure-program-taxpayers-with-undisclosed-foreign-assets-urged-to-come-forward-now (last visited Aug. 23, 2022).

> 22,[sic]1)[2] was due to non-willful conduct. Non-willful conduct is conduct that is due to negligence, inadvertence, or mistake or conduct that is the result of a good faith misunderstanding of the requirements of the law[.]

Id. (alterations and footnote added). According to the IRS website, "the streamlined filing process will not culminate in the signing of a closing agreement with the IRS," resolving all potential liability related to foreign accounts, but rather "returns submitted under the streamlined procedures may be subject to IRS examination, additional civil penalties, and even criminal liability, if appropriate." Id.

The Streamlined Procedures are divided into two sets of procedures, distinguished by the "residency" of the taxpayers eligible to participate: non-United States "residents" are eligible to participate in the Streamlined Foreign Offshore Procedures, while United States "residents" are able to participate in the Streamlined Domestic Offshore Procedures. See id. Because the taxpayer with whom the above captioned case is concerned, Margaret J. Jones, was a "resident" as well as a citizen of the United States during the time at issue, the Streamlined Domestic Offshore Procedures are the procedures relevant to the case currently before the court. On a different page, the IRS website contains further information specific to the Streamlined Domestic Offshore Procedures:

> U.S. taxpayers (U.S. citizens, lawful permanent residents, and those meeting the substantial presence test of IRC section 7701(b)(3)) eligible to use the Streamlined Domestic Offshore Procedures must (1) for each of the most recent 3 years for which the U.S. tax return due date (or properly applied for extended due date) has passed (the "covered tax return period"), file amended tax returns, together with all required information returns (e.g., Forms 3520, 3520-A, 5471, 5472, 8938, 926, and 8621), (2) for each of the most recent 6 years for which the FBAR due date has passed (the "covered FBAR period"), file any delinquent FBARs (FinCEN Form 114, previously Form TD F 90-22.1), and (3) pay a Title 26 miscellaneous offshore penalty. The full amount of the tax, interest, and miscellaneous offshore penalty due in connection with these filings should be remitted with the amended tax returns.

> The Title 26 miscellaneous offshore penalty is equal to 5 percent of the highest aggregate balance/value of the taxpayer's foreign financial assets that are subject to the miscellaneous offshore penalty during the years in the covered tax return period and the covered FBAR period. For this purpose, the highest aggregate balance/value is determined by aggregating the year-end account balances and year-end asset values of all the foreign

---

[2] In the above citation, "FBAR" is an abbreviation for the "Report of Foreign Bank and Financial Accounts," including Form TD-F 90-22.1 and successor forms such as the FinCEN Form 114 referenced above. Requirements of FBAR filings and penalties for failure to file are discussed more fully below.

financial assets subject to the miscellaneous offshore penalty for each of the years in the covered tax return period and the covered FBAR period and selecting the highest aggregate balance/value from among those years.

A foreign financial asset is subject to the 5-percent miscellaneous offshore penalty in a given year in the covered FBAR period if the asset should have been, but was not, reported on an FBAR (FinCEN Form 114) for that year. A foreign financial asset is subject to the 5-percent miscellaneous offshore penalty in a given year in the covered tax return period if the asset should have been, but was not, reported on a Form 8938 for that year. A foreign financial asset is also subject to the 5-percent miscellaneous offshore penalty in a given year in the covered tax return period if the asset was properly reported for that year, but gross income in respect of the asset was not reported in that year.

U.S. Taxpayers Residing in the United States, INTERNAL REVENUE SERVICE, https://www.irs.gov/individuals/international-taxpayers/u-s-taxpayers-residing-in-the-united-states (last visited Aug. 23, 2022). The IRS website additionally states that

if returns properly filed under these procedures are subsequently selected for audit under existing audit selection processes, the taxpayer will not be subject to accuracy-related penalties with respect to amounts reported on those returns, or to information return penalties or FBAR penalties, unless the examination results in a determination that the original return was fraudulent and/or that the FBAR violation was willful.

Id.

In a separate section from, but on the same page as, the above-reproduced instructions, the IRS website provides "Specific Instructions" for the Streamlined Domestic Offshore Procedures, including the following:

Complete and sign a statement on the Certification by U.S. Person Residing in the U.S. (Form 14654) certifying: (1) that you are eligible for the Streamlined Domestic Offshore Procedures; (2) that all required FBARs have now been filed (see instruction 9 below); (3) that the failure to report all income, pay all tax, and submit all required information returns, including FBARs, resulted from non-willful conduct; and (4) that the miscellaneous offshore penalty amount is accurate (see instruction 5 below). You must maintain your foreign financial asset information supporting the self-certified miscellaneous offshore penalty computation and be prepared to provide it upon request. You must submit an original signed statement and attach copies of the statement to each tax return and information return being submitted through these procedures. You should not attach copies of the statement to FBARs. Failure to submit this statement, or submission of an incomplete or otherwise deficient statement, will result in returns being

processed in the normal course without the benefit of the favorable terms
of these procedures.

Id.

The "miscellaneous offshore penalty" identified by the Streamlined Domestic
Offshore Procedures instructions is relevant to the case currently before the court, as
plaintiffs only seek the return of the Miscellaneous Offshore Penalty paid by Mrs. Jones
upon application to the Streamlined Procedures. According to defendant's motion to
dismiss, payment of the Miscellaneous Offshore Penalty for the Streamlined Procedures
could only "'serve as a compromise for all penalties not involving willfulness for the three
years covered by the program,'" and the IRS could still pursue participating taxpayers "for
fraud-related penalties for all years and for willful FBAR penalties for all years, as well as
for other penalties from the years *prior* to the three years submitted under the Streamlined
Procedures."[3] (emphasis in original) (quoting <u>Maze v. United States</u>, 206 F. Supp. 3d 1,
7 (D.D.C. 2016)).

In addition to the Miscellaneous Offshore Penalty associated with the Streamlined
Procedures, discussed above, this case concerns a second, separate category of penalty,
what are referred to as willful FBAR penalties. Under the Bank Secrecy Act, 31 U.S.C. §§
5311 <u>et</u> <u>seq.</u> (2018),

the Secretary of the Treasury shall require a resident or citizen of the United
States or a person in, and doing business in, the United States, to keep
records, file reports, or keep records and file reports, when the resident,
citizen, or person makes a transaction or maintains a relation for any person
with a foreign financial agency.

31 U.S.C. § 5314(a). The regulation at 31 C.F.R. § 1010.350 (2021), promulgated
pursuant to the Bank Secrecy Act, prescribes the use of "the Report of Foreign Bank and
Financial Accounts [FBAR] (TD-F 90-22.1), or any successor form," for reports required
under 31 U.S.C. § 5314. 31 C.F.R. § 1010.350(a) (2021). "FBAR" is an acronym for the
report required under the Bank Secrecy Act, and penalties assessed for failure to comply
with FBAR reporting requirements are referred to as "FBAR penalties."

---

[3] By contrast, participation in the OVDP, which is not at issue in this case, afforded the
following benefits: a compromise of all penalties owed by the taxpayer, including FBAR
penalties, except accuracy-related and failure-to-file penalties; not to "recommend
criminal prosecution to the Department of Justice for any issue relating to tax
noncompliance or failure to file Report of Foreign Bank and Financial Accounts [FBARs];"
and a closing agreement settling tax obligations relating to the disclosed period and prior
years. <u>Offshore Voluntary Disclosure Program Frequently Asked Questions and Answers
2014</u>, INTERNAL REVENUE SERVICE, https://www.irs.gov/individuals/international-
taxpayers/offshore-voluntary-disclosure-program-frequently-asked-questions-and-
answers-2014 (last visited Aug. 23, 2022).

FBAR penalties are assessed pursuant to 31 U.S.C. § 5321 against United States citizens and residents who fail to report their interest in any foreign accounts they hold, as required by the statute at 31 U.S.C. § 5314 and the implementing regulation, 31 C.F.R. § 1010.350. In general, FBAR penalties "shall not exceed $10,000." 31 U.S.C. § 5321(a)(5)(B)(i). The statute at 31 U.S.C. § 5321(a)(5)(C), however, provides that "[i]n the case of any person willfully violating, or willfully causing any violation of, any provision of section 5314," the FBAR penalty shall be assessed at the greater of $100,000.00, id. § 5321(a)(5)(C)(i)(I), or, as relevant to the above captioned case, "50 percent of the amount" of "the balance in the account at the time of the violation." Id. §§ 5321(a)(5)(C)(i)(II), 5321(a)(5)(D)(ii).[4]

According to plaintiffs' complaint, Margaret J. Jones was a citizen of Canada and of the United States at the time of her death on March 11, 2021. According to plaintiffs' complaint, "Mrs. Jones was born in Canada in 1928 and lived there for the first 26 years of her life." Jeffrey L. Jones, Mrs. Jones' late husband, "was born in New Zealand in 1919 and lived there for the first thirty years of his life." Mrs. Jones and her husband met and were married in Canada and in 1954 Mrs. Jones and her husband moved to the United States, to California. According to plaintiffs' complaint, Mrs. Jones and her husband became citizens of the United States in 1969. According to plaintiffs' complaint, Mrs. Jones and her husband both possessed a high school education and neither attended college, "[n]or did either of them ever have any formal tax, accounting, financial, or legal training." Mr. Jones died on March 11, 2013. Margaret Jones died on March 11, 2021.

While living in the United States, Mrs. Jones and her husband maintained foreign bank accounts in Canada and New Zealand. According to plaintiffs' Proposed Statement of Uncontroverted Facts originally filed in support of a summary judgment motion in one of the actions filed by or against Mrs. Jones, in her own capacity or as executor of Mr. Jones' estate, in the United States District Court for the Central District of California, Jones v. United States, No.19-00173-JVS(RAO),[5] which was attached to plaintiffs' current

---

[4] The statute at 31 U.S.C. § 5321(a)(5)(C)(ii) additionally states that, for willful violations of the FBAR reporting requirement, "subparagraph (B)(ii)," which prescribes that "[n]o penalty shall be imposed" when "such violation was due to reasonable cause" and the amount in question "was properly reported," 31 U.S.C. § 5321(a)(5)(B)(ii)(I)-(II), "shall not apply." Id. § 5321(a)(5)(C)(ii).

[5] As discussed further below, three cases regarding the tax obligations of Mr. and Mrs. Jones were filed in the Central District of California prior to the filing of the above captioned case in this court: Margaret Jones, as Executor, Estate of Jeffrey Jones v. United States, Case No. 19-00173-JVS(RAO), brought by Mrs. Jones, on behalf of the estate of her husband, to recover a partial payment made on a penalty assessed against the estate; Margaret Jones v. United States, Case No. 19-04950-JVS(RAO), brought by Mrs. Jones, in her individual capacity, to recover a partial payment made on a penalty assessed against her individually; and United States v. Margaret Jones, Individually, and Margaret Jones, as Executor, Estate of Jeffrey Jones, Case No. 20-06173-JVS(RAO),

complaint in this court, Mrs. Jones and her husband had eleven foreign accounts during the period of time at issue in this case: "three in Canada and eight in New Zealand." According to the same Proposed Statement of Uncontroverted Facts, of the eleven foreign accounts, "[f]our of the New Zealand accounts were solely in the name of Mr. Jones," "[t]hree of the foreign accounts (two in Canada and one in New Zealand) were solely in the name of Mrs. Jones," and Mrs. Jones and her husband "jointly held four foreign accounts," one in Canada and three in New Zealand. From the record before the court, it appears that prior to the death of Mr. Jones, Mrs. Jones and her husband did not report or otherwise disclose the existence of the foreign accounts to the IRS in their tax returns or to their tax return preparer, Mr. William Burke, a certified public accountant.

According to plaintiffs' complaint in this court, on July 7, 2014, more than one year after her husband's death, Mrs. Jones completed two "Forms 1040X, for each of the tax years 2011 and 2012, reporting all unreported income from all the foreign accounts . . . paying outstanding income taxes, and checking the 'yes' box on the Schedule B acknowledging the ownership of foreign accounts." The Forms 1040X are titled "Amended U.S. Individual Income Tax Return," (capitalization in original), and Mrs. Jones filed the Forms 1040X for both 2011 and 2012 jointly with the estate of her husband, filling in the names of Jeffrey L. Jones and of Margaret J. Jones, as well as including their respective Social Security numbers, on both Forms 1040X. Both Forms 1040X are referenced in plaintiffs' complaint in this court. The Forms 1040X completed by Mrs. Jones appear to be the first acknowledgement to the IRS by Mrs. Jones, both in her individual capacity and as the executor of her husband's estate, regarding ownership of the foreign accounts. Each Form 1040X provides, in relevant part, amended information regarding Mr. and Mrs. Jones' adjusted gross income, taxable income, and tax liability for the relevant tax year. Attached to each Form 1040X is an amended Schedule B, "Interest and Ordinary Dividends," for the relevant year, which, like the Forms 1040X they accompany, were referenced in plaintiffs' complaint and filed with this court.

The Form 1040X for tax year 2011 notes corrections to what was originally reported for the adjusted gross income, taxable income, and tax liability for Mr. and Mrs. Jones for tax year 2011. Mr. and Mrs. Jones' adjusted gross income, originally reported as $445,691.00, should have been reported as $696,900.00, a difference of $251,209.00 for tax year 2011; Mr. and Mrs. Jones' taxable income, originally reported as $395,847.00, should have been reported as $647,056.00, also a difference of $251,209.00 for tax year 2011; and Mr. and Mrs. Jones' tax liability, originally reported as $120,931.00, should have been $172,035.00, a difference of $51,104.00 for tax year 2011.

As noted above, attached to the Form 1040X for 2011 is an amended Schedule B for the same tax year. The amended Schedule B for tax year 2011, which is titled "Interest and Ordinary Dividends," and which states "[a]ttach to Form 1040A or 1040," includes three parts, "Part I Interest," "Part II Ordinary Dividends," and "Part III Foreign Accounts

_____

brought by the government to recover the balance due on the penalties assessed against Mrs. Jones and against the estate of Mr. Jones.

and Trusts."[6] For Parts I and II, Mrs. Jones listed the interest and dividends, respectively, from financial institutions, including ANZ Bank, Bell Gully, Chase, County Commerce Bank, Heartland Bank, Morgan Stanley, New Zealand Inland Revenue, Royal Bank of Canada, US Bank, and Wells Fargo, in Part I, and Morgan Stanley, in Part II. "Part III Foreign Accounts and Trusts" asks the following questions, to which Mrs. Jones provided the following answers:

| | Yes | No |
|---|---|---|
| You must complete this part if you (a) had over $1,500 of taxable interest or ordinary dividends; (b) had a foreign account; or (c) received a distribution from, or were a grantor of, or a transferor to, a foreign trust. | | |
| **7a** At any time during 2011, did you have a financial interest in or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country? See instructions …………………………………………………………………… | X | |
| If 'Yes,' are you required to file Form TD F 90-22.1 [FBAR] to report that financial interest or signature authority? See Form TD F 90-22.1 and its instructions for filing requirements and exceptions to those requirements …………………………………........................................... | X | |
| **b** If you are required to file Form TD F 90-22.1, enter the name of the foreign country where the financial account is located. **SEE STATEMENT 8** | | |
| **8** During 2011, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust? If 'Yes,' you may have to file Form 3520. See instructions …………………………………………………………………… | | X |

(capitalization and emphasis in original). Mrs. Jones also attached to the Form 1040X amended tax return for 2011 an "Explanation of Changes" which references Part III of the amended Schedule B for 2011 and states:

---

[6] Plaintiffs' filings frequently refer to "Part IV" of the amended Schedule B form. The amended Schedule B forms included in the record currently before this court do not contain a "Part IV," although plaintiffs state in their response to defendant's motion to dismiss that Mrs. Jones "check[ed] the 'yes' box on the Part IV of Schedule B, reflecting ownership of these foreign accounts." Plaintiffs' references to "Part IV" and "the 'yes' box" therein appear, therefore, to be references to "Part III Foreign Accounts and Trusts" of Schedule B, which does contain a "'yes' box" that Mrs. Jones checked in her amended tax returns, Forms 1040X, for the tax years 2011 and 2012.

MRS. MARGARET JOSEPHINE JONES IS A CANADIAN CITIZEN AND A U.S. TAX RESIDENT.[7] SHE IS 85 YEARS OLD AND HAS BEEN RESIDING IN THE U.S. FOR MANY YEARS AS A NATURALIZED CITIZEN.

MR. JEFFREY LEWIS JONES, THE LATE HUSBAND OF MRS. JONES, PASSED AWAY IN MARCH 2013 AT AGE 93. HE WAS A NEW ZEALAND CITIZEN AS WELL AS A U.S. TAX RESIDENT AND NATURALIZED CITIZEN.

MRS. JONES'S UNDERSTANDING WAS THAT THE TAXES WITHHELD IN THE FOREIGN COUNTRIES, SUCH AS NEW ZEALAND'S 10% WITHHOLDING TAX, WERE THE FINAL TAXES DUE ON THOSE INCOME AMOUNTS UNTIL SUCH TIME AS THE UNDERLYING FUNDS WERE BROUGHT INTO THE U.S.

THIS FORM 1040X IS BEING FILED TO INCLUDE IN INCOME THE AMOUNTS OF INTEREST INCOME GENERATED BY THE BANK ACCOUNTS FOR THE RELEVANT YEAR AND TO REVISE THE AMOUNT OF FOREIGN TAX CREDIT CLAIMED FOR ANY WITHHOLDING TAXES PAID.

THE ADDITIONAL INTEREST INCOME INCREASES ADJUSTED GROSS INCOME BY $251,209 (LINE 8A, FORM 1040). IN ADDITION, A FOREIGN TAX CREDIT OF $22,699 IS BEING CLAIMED (LINE 47, FORM 1040). THE COMBINED CHANGES INCREASE TAX BY $51,104.

(capitalization in original).

Mrs. Jones also completed a Form 1040X amended tax return for tax year 2012 on behalf of herself and her deceased husband, which defendant filed with the court. The Form 1040X for tax year 2012 notes corrections to what was originally reported for the adjusted gross income, taxable income, and tax liability for Mr. and Mrs. Jones for tax year 2012. Mr. and Mrs. Jones' adjusted gross income, originally reported as $376,066.00, should have been reported as $621,258.00, a difference of $245,192.00 for tax year 2012; Mr. and Mrs. Jones' taxable income, originally reported as $334,380.00, should have been reported as $579,572.00, also a difference of $245,192.00 for tax year

---

[7] Mrs. Jones referred to herself as a "U.S. tax resident" on the Explanation of Changes form, presumably because as a "resident" of the United States, she was eligible to participate in the Streamlined Domestic Offshore Procedures, which are reserved for "residents" of the United States. In other documents in the record before the court, Mrs. Jones or the executor plaintiffs in this court refer to Mrs. Jones as a Canadian citizen, and to Mr. Jones as a New Zealand citizen. According to plaintiffs' complaint, however, "Mr. and Mrs. Jones became citizens of the United States in 1969."

2012; and Mr. and Mrs. Jones' tax liability, originally reported as $96,264.00, should have been $148,577.00, a difference of $52,313.00 for tax year 2012.

As with the Form 1040X for 2011, attached to the Form 1040X for 2012 is an amended Schedule B, which includes the same three parts as the Schedule B for tax year 2011, "Part I Interest," "Part II Ordinary Dividends," and "Part III Foreign Accounts and Trusts." The financial institutions listed under Parts I and II on the Schedule B for tax year 2012 are identical to those listed on the Schedule B for tax year 2011. Similarly, the questions and answers included in Part III of the Schedule B for tax year 2012 are identical to the questions and answers included in Part III of the Schedule B for tax year 2011, except that all references to 2011 in the questions instead refer to 2012 and Mrs. Jones' answer to question 7b read "**SEE STATEMENT 7**." (capitalization and emphasis in original).

As she had done for the Form 1040X for tax year 2011, Mrs. Jones attached to the Form 1040X for tax year 2012 an "Explanation of Changes" which references Part III and which was identical to the "Explanation of Changes" attached to the Form 1040X for 2011, except for the last paragraph of the Form 1040X for tax year 2012, which reads: "THE ADDITIONAL INTEREST INCOME INCREASES ADJUSTED GROSS INCOME BY $245,192 (LINE 8A, FORM 1040). IN ADDITION, A FOREIGN TAX CREDIT OF $22,986 IS BEING CLAIMED (LINE 47, FORM 1040). THE COMBINED CHANGES INCREASE TAX BY $52,313." (capitalization in original).

According to the copies of the Forms 1040X filed with the court by defendant, Mrs. Jones does not appear to have signed either the Form 1040X for 2011 or for 2012, nor was either form signed by a tax preparer of the forms. Instead, the signature portions of both Forms 1040X note in the space "Spouse's signature" that Mrs. Jones was "FILING AS SURVIVING SPOUSE," and the sections labeled "Paid Preparer Use Only" indicate that Andrew W. Gardner of Vance Thrift & Biller LLP CPAs was the preparer of the Forms 1040X, without a signature. (capitalization in original). While the Forms 1040X in the record currently before the court are not signed by Mrs. Jones or the preparer of the forms, neither plaintiffs nor defendant have contested the accuracy or operative validity of the Forms 1040X as presented to the court in this case.

After filing her amended tax returns for 2011 and 2012, Mrs. Jones applied to participate in the Streamlined Procedures to resolve her outstanding tax liability with respect to the foreign bank accounts. According to plaintiffs' complaint,

> [o]n March 16, 2015, Mrs. Jones filed a Domestic Streamlined Submission [SDO][8] with the IRS which included (i) amended joint income tax returns

---

[8] Plaintiffs frequently use "SDO" in relation to the Streamlined Procedures, including in their complaint, which refers to "the 'streamlined filing compliance procedures' for domestic individuals ('SDO')," (capitalization in original), as well as in plaintiffs' response to defendant's motion to dismiss, which states that "Mrs. Jones filed a Domestic Streamlined Submission ('**SDO**')," (capitalization and emphasis in original). Although

(Forms 1040X for 2011 and 2012 that had been previously filed on July 7, 2014 and an original form 1040 for 2013 that was filed April 15, 2014); (ii) filed outstanding FBARs for 2008 through 2013; (iii) submitted a certificate of non-willfulness, and (iv) paid a miscellaneous penalty of $156,795.26 [5%MOP] (the "Streamlined Submission").

(emphasis in original; alterations in original except "[o]n;" footnote added). Plaintiffs' complaint alleges that as part of the Streamlined Procedures, Mrs. Jones completed a Form 14654 and paid a Miscellaneous Offshore Penalty in the amount of $156,795.26, which was calculated based on five percent of "the highest account balance" of the foreign accounts held by Mrs. Jones alone and by Mr. and Mrs. Jones jointly during the years 2008 through 2013. Plaintiffs' complaint further alleges that on the Form 14654, "[t]o meet the eligibility requirements for a streamlined submission, Mrs. Jones submitted a certification under penalty of perjury certifying that her failure to report her foreign accounts did not result from willful conduct."

The record currently before the court contains two versions of the Form 14654 completed by Mrs. Jones. The first version was submitted by plaintiffs as an attachment to their complaint, but while the form was filled out, the form was unsigned and undated. The first version of the Form 14654 also is accompanied by no attachments. The second version was submitted by defendant as an attachment to the motion to dismiss currently before the court, and the second version was signed by Mrs. Jones, dated April 13, 2015, and accompanied by two attachments, Attachment A and Attachment B. Otherwise the two versions of the Form 14654 are identical. Neither party has controverted the contents of the Form 14654 or Attachments A and B. Although Mrs. Jones also was acting as the executor of her late husband's estate at the time that she completed the Form 14654, Mrs. Jones completed the Form 14654 and entered the Streamlined Procedures only with respect to her individual capacity, and not jointly for the estate of Mr. Jones.[9]

Attachment A consists of six pages, each corresponding to a tax year from 2008 to 2013 and each stating it contains "[i]nformation regarding Foreign Financial Assets Subject to the 5% Miscellaneous Offshore Penalty." (capitalization in original). Attachment A provides the year-end balance for each of the relevant tax years for the eleven bank accounts distributed among three financial institutions, Belly Gully and ANZ Bank in New

plaintiffs do not define the acronym "SDO," it appears to stand for "Streamlined Domestic Offshore," in reference to the subset of the Streamlined Procedures under which Mrs. Jones applied.

[9] That Mrs. Jones only entered the Streamlined Procedures in her individual capacity is confirmed by plaintiffs' response to defendant's motion to dismiss, which states that "the estate did not enter into the program because it was not clear it was ever available for an estate; which has since been corrected by the IRS in their later SFCP [Streamlined Filing Compliance Procedures] rules." (alteration added). The record currently before the court does not indicate whether Mrs. Jones or her executors ever filed to enter the Streamlined Procedures on behalf of the estate of Mr. Jones after the IRS issued its correction.

Zealand and Royal Bank of Canada in Canada. Attachment A provides that the total year-end balance of the eleven foreign accounts was $1,557,423.37 in 2008, $1,997,024.69 in 2009, $2,908,403.63 in 2010, $2,948,375.11 in 2011, $3,135,905.24 in 2012, and $3,001,106.12 in 2013. According to the Proposed Statement of Uncontroverted Facts and Conclusions of Law, previously filed by Mrs. Jones in proceedings in the Central District of California and attached to plaintiffs' complaint in the above captioned case, all the accounts listed in Attachment A to Mrs. Jones' Form 14654 were held either in the name of Mrs. Jones alone or jointly in the names of Mr. and Mrs. Jones.

In Attachment B, Mrs. Jones states the following:

As the attachment B of the IRS Form 14654, I, Mrs. Margaret J. Jones, am providing the specific reasons why, due to non-willful conduct, I did not report all income, pay all tax, and submit all required information returns with respect to my foreign financial assets.

Based on the facts listed below, I will explain my misunderstandings regarding the foreign financial assets belonging to my late husband and I, going back to World War II; and why my misunderstanding was in good faith and based upon what I have now learned was an erroneous belief about U.S. taxation of foreign source income.

1. I am a Canadian citizen and a U.S. tax resident. I have been residing in the U.S. for many years, where I became a naturalized citizen.

2. My late (deceased) husband, Mr. Jeffrey Lewis Jones, was born on November 25, 1919, and passed away in March 2013. He was born in New Zealand and was always a citizen as well as a U.S. tax resident and naturalized citizen.

3. Around the time of World War II, and while a resident of New Zealand, my husband established certain investment accounts in New Zealand. I was not aware of these accounts until fairly recently, when he became ill shortly before his death.

4. My husband also inherited various New Zealand assets from his parents when they passed away in New Zealand several decades ago.

5. Prior to his death, my husband added me as a joint owner of some of his New Zealand accounts. Neither my husband nor I ever used or spent the funds in these accounts as it was our understanding that we would be subject to U.S. taxation (in addition to New Zealand taxation) if those assets were brought to the U.S.

6. I separately established savings accounts in Canada many decades ago, when I was living in Canada. Similarly, these Canadian accounts

grew substantially over the years. Jointly, the Canadian and New Zealand accounts will be referenced as the "Bank Accounts."

7.   Neither I, nor my late husband ever spent or withdrew funds from any of the Bank Accounts.

8.   The assets and funds were held under my name only, where I was transparent and openly communicated with the foreign financial and legal advisors regarding the ongoing investments and reinvestments.

9.   I do not have specific training or a background in tax, finance, or related accounting matters, although I consider myself an educated and knowledgeable woman (now of an advanced age).

10.  I was under the belief (which I now realize was a misunderstanding, based upon subsequent legal advice I received) that unless assets are brought to the United States, the income from those foreign assets are not subject to U.S. income taxation and would only be taxed in the foreign country where the income is earned.

11.  My understanding was that the taxes withheld in the foreign countries, such as New Zealand's withholding tax, were the final taxes due on those income amounts until such time as the underlying funds were brought into the U.S. Such understanding was based on advice my husband received from this New Zealand tax and legal counsel. Hence the assets were left in the foreign accounts during our lifetimes.

12.  My husband and I had been jointly filing U.S. federal income tax returns for the last several years, but we never reported the interest income generated by the Bank Accounts on those returns based upon our erroneous understanding of how the U.S. tax laws apply to foreign source income.

13.  Neither my husband nor I filed Treasury Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts reporting our interests in the Bank Accounts (the "**FBAR**"), prior to doing so for the 2013 tax year because we were never advised of the requirement to file such FBAR form.

14.  My husband and I always hired a professional tax return preparer (who was a U.S. CPA), to prepare our U.S. federal and California income tax returns.

15.  My husband's and my U.S. CPA, who prepared our U.S. income tax returns, knew that I am from Canada and that my husband was from New Zealand. He was aware that I am a Canadian citizen and

immigrant to the U.S. and that my late husband was a New Zealand citizen and immigrant to the U.S.

16. My husband's and my U.S. CPA never asked the two of us if we had assets in either of our native countries of New Zealand or Canada. He also never asked my husband or me if we had foreign accounts that would need to be reported.

17. None of the U.S. tax return preparers of my husband and I ever advised us of the requirements: (i) to file annual FBAR forms, and (ii) report our interest income earned from the Bank Accounts on our annual Form 1040.

18. I started to become aware of various reporting requirements of foreign bank accounts after contacting my current U.S. tax attorney, who specializes in international tax and reporting matters.

19. I have otherwise complied with my U.S. tax reporting and compliance responsibilities under the law and have been meticulous and detailed about complying with all laws and taxation laws.

In short, the facts presented above demonstrate that my understanding of the law was a good faith misunderstanding of how United States taxation law applies to assets located in the country of origin of immigrants, such as is my case since I am from Canada and my late (deceased) husband who was from New Zealand.

As a result, the consequence of my actions was non-willful.

(capitalization and emphasis in original). At the bottom of Attachment B is the following certification: "Under penalties of perjury, I declare that I have examined this document, all attachments, and accompanying statements, and to the best of my knowledge and belief, they are true, correct, and complete." Mrs. Jones signed and certified Attachment B.

On the Form 14654, Mrs. Jones provided the following certification:

I am providing amended income tax returns, including all required information returns, for each of the most recent 3 years[10] for which the

---

[10] The references on the Form 14654 to "3 years" and to the years 2011, 2012, and 2013 in the context of amended tax returns appear to relate to the requirement, stated on the IRS website, noted above, that participants in the Streamlined Domestic Offshore Procedures are required to, "for each of the most recent 3 years for which the U.S. tax return due date (or properly applied for extended due date) has passed (the 'covered tax return period'), file amended tax returns . . . ." U.S. Taxpayers Residing in the United States, Internal Revenue Service, https://www.irs.gov/individuals/international-

U.S. tax return due date (or properly applied for extended due date) has passed. I previously filed original tax returns for these years. The tax and interest I owe for each year are as follows[.]

(alterations added). On the Form 14654, Mrs. Jones entered "$0.00" as the "Amount of Tax I Owe" for each of the tax years 2011, 2012, and 2013. (capitalization in original). Mrs. Jones further certified on the Form 14654 that:

> I failed to report income from one or more foreign financial assets during the above period.

> I meet all the eligibility requirements for the Streamlined Domestic Offshore procedures.

> If I failed to timely file correct and complete FBARs for any of the last 6 years, I have now filed those FBARs.

> During each year in either my 3-year covered tax return period or my 6-year covered FBAR period, my foreign financial assets subject to the 5% miscellaneous offshore penalty were as follows[.]

(capitalization in original; alterations added). According to the Form 14654, rather than using the spaces provided on the form, Mrs. Jones wrote for each of the tax years 2008 through 2013, "[p]lease find all accounts information in Page 1[-6] of Attachment A[.]" (alterations added). The Form 14654 states at the conclusion of the certification: "**The assets listed in this certification are my only foreign financial assets subject to the 5% miscellaneous offshore penalty.**" (emphasis in original).

Following the certification, the Form 14654 provides for the taxpayer completing the form to compute the Miscellaneous Offshore Penalty. The Form 14654 directs Mrs. Jones to "*enter the highest total balance/asset value among the years listed above*," referring to the years 2008 through 2013. (emphasis in original). Mrs. Jones entered "$3,135,905.24 for tax year 2012" in the space provided. The Form 14654 then provides that the Miscellaneous Offshore Penalty would be equal to the "*Highest Account Balance/Asset Value from above multiplied by 5%*," which on Mrs. Jones' form equaled $156,795.26. (emphasis in original). The Form 14654 also states: "Note: Your payment should equal the total tax and interest due for all three years [2011, 2012, and 2013] plus the miscellaneous offshore penalty. You may receive a balance due notice or a refund if the tax, interest, or penalty is not calculated correctly." Mrs. Jones indicated that she owed nothing aside from the Miscellaneous Offshore Penalty, and for this reason in the space labeled "Total Payment" on the Form 14654, Mrs. Jones entered an amount equal to the Miscellaneous Offshore Penalty.

---

taxpayers/u-s-taxpayers-residing-in-the-united-states (last visited Aug. 23, 2022). For Mrs. Jones, the three years would have been 2011, 2012, and 2013, because the "tax return due date" for 2014, April 15, 2015, had not yet passed.

Following the calculation section of the Miscellaneous Offshore Penalty to be paid by Mrs. Jones, Mrs. Jones' Form 14654 includes the following:

> In consideration of the Internal Revenue Service's agreement not to assert other penalties with respect to my failure to report foreign financial assets as required on FBARs or Forms 8938 or my failure to report income from foreign financial assets, I consent to the immediate assessment and collection of a Title 26 miscellaneous offshore penalty for the most recent of the three tax years for which I am providing amended income tax returns. I waive all defenses against and restrictions on the assessment and collection of the miscellaneous offshore penalty, including any defense based on the expiration of the period of limitations on assessment or collection. I waive the right to seek a refund or abatement of the miscellaneous offshore penalty.

> I agree to retain all records (including, but not limited to, account statements) related to my assets subject to the 5% miscellaneous offshore penalty until six years from the date of this certification. I also agree to retain all records related to my income and assets during the period covered by my amended income tax returns until three years from the date of this certification. Upon request, I agree to provide all such records to the Internal Revenue Service.

> My failure to report all income, pay all tax, and submit all required information returns, including FBARs, was due to non-willful conduct. I understand that non-willful conduct is conduct that is due to negligence, inadvertence, or mistake or conduct that is the result of a good faith misunderstanding of the requirements of the law.

> I recognize that if the Internal Revenue Service receives or discovers evidence of willfulness, fraud, or criminal conduct, it may open an examination or investigation that could lead to civil fraud penalties, FBAR penalties, information return penalties, or even referral to Criminal Investigation.

> Provide specific reasons for your failure to report all income, pay all tax, and submit all required information returns, including FBARs. If you relied on a professional advisor, provide the name, address, and telephone number of the advisor and a summary of the advice. If married taxpayers submitting a joint certification have different reasons, provide the individual reasons for

each spouse separately in the statement of facts. The field below[11] will automatically expand to accommodate your statement of facts.

The Form 14654 concludes with a declaration by Mrs. Jones that the information contained in the Form 14654 and "all accompanying schedules and statements" was "true, correct, and complete."

It is the Form 14654, with the terms contained therein and the accompanying payment of the Miscellaneous Offshore Penalty, which plaintiffs claim, in Count One of their complaint filed in this court, constituted a contract between Mrs. Jones and the IRS. According to plaintiffs' complaint, Mrs. Jones paid the Miscellaneous Offshore Penalty to the IRS as calculated by Mrs. Jones on the Form 14654, in the amount of $156,795.26.

After Mrs. Jones submitted her Form 14654 and paid the Miscellaneous Offshore Penalty, Internal Revenue Agent Keli Stelmar informed Mrs. Jones, in a letter dated September 13, 2016, which was attached to defendant's motion to dismiss, that her "federal return for the period(s) shown above was selected for examination" with respect to the "Tax period(s)" "December 31, 2013." The letter instructed Mrs. Jones to "call me on or before the response date" of September 27, 2016 to discuss five matters: (1) "[i]tems on your return that I will be examining;" (2) "[t]ypes of documents I will ask you to provide;" (3) "[t]he examination process;" (4) "[a]ny concerns or questions you may have;" and (5) "[t]he date, time and agenda for our first meeting." The letter referred to "preliminary items identified for examination," and listed only one, "[i]ncome," although the letter stated that "[d]uring the course of the examination, it may be necessary to add or reduce the list of items."

According to the record before the court, in 2018, the IRS commenced an examination of the Joneses' failure to report their foreign accounts. In a letter dated May 11, 2018, Internal Revenue Agent Keli Kim (formerly Keli Stelmar) informed Mrs. Jones that, "[a]s the executrix of the Estate of Jeffrey L. Jones, we are notifying you of an examination of Jeffrey L. Jones' compliance with the filing of FinCEN Report 114 (formerly Form TD F 90-22.1) Report of Foreign Bank and Financial Accounts (FBAR)." The letter informed Mrs. Jones that

Section 5314[12] of Title 31 of the United States Code (U.S.C.) requires U.S. persons, including U.S. citizens, U.S. residents, and certain entities formed

---

[11] Rather than filling in the field referred to in the Form 14654's instructions, Mrs. Jones inserted the statement, "[p]lease see Attachment B as the statement with respect to the specific reasons for the Taxpayer," (capitalization in original), which is discussed above.

[12] 31 U.S.C. § 5314 (2018) provides:

(a) Considering the need to avoid impeding or controlling the export or import of monetary instruments and the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency,

under U.S. law, to report their financial interest in or authority over any foreign financial accounts if the total value of these financial accounts exceeds $10,000[13] during a calendar year.

---

the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency. The records and reports shall contain the following information in the way and to the extent the Secretary prescribes:

    (1) the identity and address of participants in a transaction or relationship.

    (2) the legal capacity in which a participant is acting.

    (3) the identity of real parties in interest.

    (4) a description of the transaction.

(b) The Secretary may prescribe—

    (1) a reasonable classification of persons subject to or exempt from a requirement under this section or a regulation under this section;

    (2) a foreign country to which a requirement or a regulation under this section applies if the Secretary decides applying the requirement or regulation to all foreign countries is unnecessary or undesirable;

    (3) the magnitude of transactions subject to a requirement or a regulation under this section;

    (4) the kind of transaction subject to or exempt from a requirement or a regulation under this section; and

    (5) other matters the Secretary considers necessary to carry out this section or a regulation under this section.

(c) A person shall be required to disclose a record required to be kept under this section or under a regulation under this section only as required by law.

31 U.S.C. § 5314.

[13] The $10,000 requirement stated in the May 11, 2018 letter and in later correspondence from the IRS appears to be a reference to 31 C.F.R. § 1010.306(c), a regulation promulgated pursuant to the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., which

An FBAR examination is not an income tax examination. However, you may be liable for penalties for failure to comply with 31 U.S.C. Section 5314. If you're required to file, you should report information about these foreign bank and financial accounts on FinCEN Report 114. You must file the form electronically with the Financial Crimes Enforcement Network (FinCEN) on or before June 30 of the subsequent year. For example, the FBAR for calendar year 2013 was due by June 30, 2014. If you're required to file an FBAR, you must keep certain records for five years.

According to plaintiffs' complaint, following the May 11, 2018 letter notifying Mrs. Jones of the FBAR examination, Mrs. Jones received two assessment letters from the IRS. Each assessment letter purported to assess a "willful FBAR penalty," the first letter assessing a penalty against Mr. Jones, through his estate, and the second letter assessing a penalty against Mrs. Jones. While the two assessment letters appear in the same format and reach the same conclusion with respect to willfulness for Mr. Jones and Mrs. Jones, respectively, the two assessment letters consider different facts or "factors" as relevant to their respective determinations of willfulness, consider the balances of different accounts in their calculation of the willful FBAR penalties, calculate different FBAR penalties, and cover different years of FBAR violations. Moreover, the assessment letters were received by Mrs. Jones on different dates, months apart, and, as a result, Mrs. Jones took different approaches to challenging the willful FBAR penalties asserted in the assessment letters.

As an initial matter, both assessment letters refer to Keli Kim as the "[p]erson to contact." Both assessment letters also include the following information with respect to appealing the FBAR penalty assessment:

**If you agree**

If you agree to the assessment and collection of the proposed penalties, please sign, date, and return the enclosed Form 13449, *Agreement to Assessment and Collection of Penalties Under 31 USC 5321 (a)(5) and 5321 (a)(6),* in the envelope provided by the response due date, which is 30 days from the date of this letter. Make your check or money order payable to the United States Treasury for the amount indicated on the agreement form. If you agree but can't pay in full, pay what you can with the Form 13449 by the response due date and we'll send you a bill for the remaining amount with information on your payment options. We enclosed Notice 1330, *Information on Making FBAR Penalty Payment by Check.*

_____

provides: "Reports required to be filed by § 1010.350 [FBAR reports] shall be filed with FinCEN on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." 31 C.F.R. § 1010.306(c) (2021) (alteration added).

**If you disagree**

If you don't agree to the assessment and collection of the proposed penalties, you can request a conference with our Appeals Office. To do so, mail your written protest to the address shown at the top of this letter. Direct your letter to the attention of the person listed as the "Person to contact" at the top of this letter. We must receive your protest by the response due date, which is 30 days from the date of this letter. Include the following in your written protest:

1. A request for conference;

2. Your name, address, and daytime telephone number;

3. Your social security number, individual taxpayer identification number, or employer identification number;

4. The date and number of this letter;

5. The calendar years involved;

6. The penalties you're contesting;

7. An explanation of why you contest those penalties, including any reasonable cause explanation;

8. All information pertinent to your position;

9. If applicable, a statement of law or other authority that you relied on, and how that law or other authority applies to your case; and

10. The following signed statement: "Under penalties of perjury, I declare that I have examined the facts presented in this statement and any accompanying information, and, to the best of my knowledge and belief, they are true and complete."

**Note:** If you're a representative submitting a protest on behalf of another person, you should substitute a statement that you prepared the protest, and that you know personally the statement of facts contained in the protest are true and correct. Generally, you can rely in good faith on information your client provides. However, you must ask reasonable questions if the information appears to be incorrect, inconsistent, or incomplete.

(capitalization and emphasis in original).

In addition, each assessment letter was accompanied by a Form 886-A, "EXPLANATION OF ITEMS," (capitalization in original), which set forth the facts and analysis in support of the willful[14] FBAR penalty assessments for the taxpayers and tax years which are the subjects of their respective assessment letters. Plaintiffs identify each Form 886-A by the name "Revenue Agent Report," or the acronym "RAR." The Forms 886-A for Mr. and Mrs. Jones present the same format for analyzing the conduct concerning their respective accounts. Both Forms 886-A are addressed "[t]o determine the taxpayer's willful FBAR penalty pursuant to 31 U.S.C. § 5321(a)(5)." Both Forms 886-A determine that Mr. and Mrs. Jones "had an FBAR filing requirement," because Mr. and Mrs. Jones each "was a U.S. person;" "had a financial account in a foreign country;" "had a financial interest in the account or signature or other authority over the foreign financial account; and" because "[t]he aggregate amount in the foreign financial accounts exceeded $10,000 in U.S. currency at any time during the year." Both Forms 886-A, moreover, conclude that Mr. and Mrs. Jones, respectively, do not qualify for a "reasonable cause" defense because they failed to disclose their foreign accounts to their tax return preparer and "thereby eliminated a good-faith reliance defense."

The first assessment letter, dated July 26, 2018, and accompanying Form 886-A, were sent by the IRS to the "Estate of Jeffrey L. Jones" and to "Margaret Jones, Executor." The first assessment letter states that the IRS was "proposing a penalty" on the estate of Mr. Jones "for violating the reporting or record keeping requirements for foreign financial accounts." The first assessment letter and Form 886-A sent to Mr. Jones' estate concern only calendar year 2011. The Form 886-A attached to the first assessment letter analyzes the values of foreign bank accounts held by Mr. Jones alone and calculates a willful FBAR penalty based on account values in 2011 only.

The Form 886-A for Mr. Jones lists the foreign accounts held by Mr. Jones alone and by Mr. and Mrs. Jones jointly, and identifies two accounts at ANZ Bank, one account at Heartland Bank, and one account at Morrison Kent as being owned by Mr. Jones alone, and two accounts at Royal Bank of Canada, three accounts at Bell Gully, and two accounts at ANZ Bank as being owned by Mr. and Mrs. Jones jointly during the tax year 2011. Despite listing accounts held jointly by Mr. and Mrs. Jones, however, the Form 886-A for Mr. Jones only considers the accounts owned by Mr. Jones alone in calculating Mr. Jones' penalty assessment, as explained below. The Form 886-A for Mr. Jones lists several factors that "were considered in evaluating the type and extent of FBAR penalties that are appropriate," for Mr. Jones alone, including <u>Knowledge of Foreign Accounts;</u>" "<u>Foreign Accounts Concealed from US Tax Return Preparer;</u>" "<u>Foreign Accounts Concealed from Internal Revenue Service;</u>" and "<u>Additional Acts of Concealment.</u>"

---

[14] The parties in their filings with the court use various labels to refer to the IRS's determination with respect to the assessment of FBAR penalties against Mrs. Jones and her late husband, including "willfulness," "willful blindness," "recklessness," and "reckless disregard." As discussed below, these ideas are broadly encompassed within the common law definition of "willfulness" employed by courts when reviewing IRS willfulness determinations. <u>See, e.g.,</u> <u>Landa v. United States</u>, 153 Fed. Cl. 585, 597 (2021).

(capitalization and emphasis in original). The Form 886-A for Mr. Jones states, with respect to "Knowledge of Foreign Accounts:"

> Mr. Jones has a number of foreign bank accounts. Some are believed to have been opened by Mr. Jones when he was residing in New Zealand prior to moving to Canada in 1952 at the age of 33. Other foreign accounts were inherited when his parents died in New Zealand at least 30 years ago. Mr. Jones was completely aware of these foreign accounts and their account balances as confirmed through statements made by his wife [Mrs. Jones] and his property manager/friend [Mrs. Guzman].

> Also, his foreign account statements and documents were mailed either to his U.S. residence or to the address of a separate property he owned (Mrs. Guzman's address).

(capitalization and emphasis in original; alterations added). With respect to "Foreign Accounts Concealed from US Tax Return Preparer," the Form 886-A for Mr. Jones states:

> Mr. Jones has gone to the same US tax preparer for 28 years. During each of those years, Mr. Jones failed to initiate any discussion with his US tax return preparer, Mr. Burke, regarding the existence of his foreign accounts.

> The New Zealand non-resident tax deduction certificates for at least one of Mr. Jones' New Zealand accounts was mailed to the Jones' residence. These certificates revealed interest income and New Zealand taxes withheld. Those certificates were not disclosed to Mr. Burke.

With respect to "Foreign Accounts Concealed from Internal Revenue Service," the Form 886-A for Mr. Jones states:

> Mr. Jones' failure to make full disclosure of relevant facts to his return preparer directly resulted in causing his return preparer to prepare false US tax returns and falsely believe that he (Mr. Jones) did not have an FBAR filing requirement.

> Specifically, Mr. Jones caused his return preparer to check the box "No" in preparing Part III of Form 1040 Schedule B for the year at issue, indicating that Mr. Jones did not have an interest in or signature or other authority over a foreign financial account. Mr. Jones signed each of the tax returns under penalty of perjury.

(capitalization and emphasis in original). With respect to "Additional Acts of Concealment," the Form 886-A for Mr. Jones states:

> Mr. Jones knew or at least should have known that he needed to seek advice from knowledgeable tax professionals in the United States. Mr.

Jones clearly did not seek such advice from his U.S. income tax preparer, Mr. Burke. It is not known whether he sought advice from any other knowledgeable U.S. tax professional. However, Mr. Jones knew that by not seeking such advice, he (Mr. Jones) was responsible for the risks and consequences for his willful blindness.

Also, Mr. Jones not only concealed his foreign accounts from his return preparer and the IRS, but he also concealed his foreign accounts from his wife, children, and the attorney who drafted the Jones Family Living Trust.

Both Mrs. Jones and their daughter stated that the Jones Family Living Trust only included US bank account and properties.

Also, per the interview with Mrs. Guzman:

- Mr. Jones' New Zealand bank documents were mailed to Mrs. Guzman's house from sometime in 1980s to 2005. The large envelopes came every 6 months.

- The New Zealand account representative also left phone messages for Mr. Jones at Mrs. Guzman's house. Mr. Jones returned the calls from Mrs. Guzman's house.

- Mr. Jones told Mrs. Guzman "this is between you and me."

(capitalization and emphasis in original). Based on these factors, the Form 886-A for Mr. Jones provides the following analysis:

Mr. Jones never disclosed to his return preparer of 28 years the fact that he had foreign bank accounts. Mr. Jones also never disclosed to his return preparer that he had foreign investment income.

As a direct result of Mr. Jones concealing this information from his return preparer, a tax return was prepared that excluded this relevant information. Mr. Jones signed the tax return, acknowledging under penalty of perjury that the tax return was true, correct and complete.

Mr. Jones failed to make relevant disclosures to or inquiries of his tax return preparer. These actions prevented his return preparer from either providing advice on these issues or assisting with finding a more qualified and experienced tax professional.

At best, Mr. Jones was willfully blind regarding his FBAR filing requirements.

In the "CONCLUSION" section, the Form 886-A assesses against Mr. Jones a willful FBAR penalty which, as noted above, is distinct from the Miscellaneous Offshore Penalty

already paid by Mrs. Jones. (capitalization and emphasis in original). The Form 886-A for Mr. Jones states that, because the "**Max. Aggregate Balance for ALL Accounts**," meaning the accounts owned by Mr. Jones alone, was greater than $1,000,000.00, the "**Willful Penalty is the GREATER of**" "$100,000 / violation" or "50% of balance at time of violation." (capitalization and emphasis in original). The Form 886-A calculates the willful FBAR penalty at "the statutory maximum of **$1,890,074** . . . ." (emphasis in original). The Form 886-A for Mr. Jones bases this assessment on the "June 30, 2012 Balance"[15] of all foreign bank accounts held by Mr. Jones in 2011, as $3,780,662.00.

The record before the court indicates that, after Mrs. Jones received the first assessment letter against Mr. Jones from the IRS, Mrs. Jones sent a pair of letters, at first challenging and seeking to appeal the IRS's assessment of a willful FBAR penalty against Mr. Jones, and ultimately withdrawing any administrative appeal with the intent of challenging the willful FBAR penalty assessment against Mr. Jones in court. The letters were filed with the court by the parties. On August 27, 2018, approximately one month after the first assessment letter, Mrs. Jones sent a letter to the IRS filing an appeal of the willful FBAR penalty assessed against Mr. Jones, arguing that Mr. Jones' failure to meet his FBAR reporting requirements "was unintentional and inadvertent, a good faith misunderstanding, and certainly not 'willful' (under any definition or construction of the term 'willfulness')." According to the record before the court, one month later, on September 27, 2018, Mrs. Jones, through her attorney, sent a second letter, stating that her "physical and mental health is deteriorating rapidly," and for that reason, the letter stated,

> we hereby withdraw the Protest [with respect to Mr. Jones] and ask that you treat the Protest as if it were never submitted. More specifically, we request that you proceed with <u>assessing</u> the 50% FBAR Penalty at issue <u>as soon as possible</u> so that Mrs. Jones, one of the primary witnesses in this case, can contest this matter in a fair, impartial, and hopefully more expeditious forum while she is still alive.

(emphasis in original; alteration added).

The second of the two assessment letters, dated October 22, 2018, and accompanying Form 886-A, were sent by the IRS to "Margaret J. Jones" in her individual capacity after Mrs. Jones withdrew her administrative challenge of the willful FBAR penalty against Mr. Jones. The second assessment letter states that the IRS was "proposing a penalty" on Mrs. Jones "for violating the reporting or record keeping requirements for foreign financial accounts." The assessment letter sent to Mrs. Jones

---

[15] The Forms 886-A for both Mr. and Mrs. Jones appear to base their assessed penalties on the balance of the accounts concerned on June 30 of the year following the year at issue; for Mr. Jones, 2011, and for Mrs. Jones, both 2011 and 2012. The use of June 30 appears to be a reference to 31 C.F.R. § 1010.306(c), which requires FBAR reports to "be filed with FinCEN on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year."

concerns two "Calendar years," "2011 & 2012." The Form 886-A attached to the second assessment letter analyzes the values of foreign bank accounts held by Mrs. Jones alone and by Mr. and Mrs. Jones jointly,[16] and calculates a willful FBAR penalty based on account values in both 2011 and 2012.

The Form 886-A directed to Mrs. Jones states that it covers both tax years 2011 and 2012. The Form 886-A for Mrs. Jones lists the foreign accounts held by Mrs. Jones alone as well as by Mr. and Mrs. Jones jointly, and identifies two accounts at Royal Bank of Canada and one account at Bell Gully as being owned by Mrs. Jones individually, and one account at Royal Bank of Canada, one account at Bell Gully, and two accounts at ANZ Bank as being owned by Mr. and Mrs. Jones jointly during the tax years 2011 and 2012.[17] The Form 886-A for Mrs. Jones lists several factors that "were considered in evaluating the type and extent of FBAR penalties that are appropriate," including "Knowledge of Foreign Accounts;" "Mrs. Jones' Background, Knowledge & Experience;" "Foreign Accounts Concealed from US Tax Return Preparer;" "Mrs. Jones' Selection of US Tax Return Preparer;" "Foreign Accounts Concealed from Internal Revenue Service;" and "Certifying Statements made by Mrs. Jones on Streamlined Application." (capitalization and emphasis in original). The Form 886-A for Mrs. Jones considers three factors not considered in the Form 886-A for Mr. Jones, namely "Mrs. Jones' Background, Knowledge & Experience," "Mrs. Jones' Selection of US Tax Return Preparer;" and "Certifying Statements made by Mrs. Jones on Streamlined Application." The Form 886-A for Mrs. Jones, however, does not consider a factor which was considered by the Form 886-A for Mr. Jones, "Additional Acts of Concealment." The Form 886-A for Mrs. Jones states, with respect to "Knowledge of Foreign Accounts:"

> Mrs. Jones has a number of individual and joint foreign bank accounts. Some are believed to have been opened by Mr. & Mrs. Jones while residing in New Zealand and Canada prior to moving to U.S. Additional New Zealand accounts were opened when their son studied in New Zealand in 1973.

> Mrs. Jones was completely aware of these foreign accounts and their account balances. She knew that her foreign investments performed "very well." Mrs. Jones also approved and directed foreign investment activities, which were communicated via email with account representatives at Bell Gully in New Zealand.

---

[16] Neither the Forms 886-A nor the assessment letters indicate why, with respect to Mr. Jones, only the balances of the accounts held solely in Mr. Jones' name were used to calculate the willful FBAR penalty, while with respect to Mrs. Jones, the accounts held solely in Mrs. Jones' name and those held jointly by her and Mr. Jones were used to calculate the willful FBAR penalty.

[17] The Forms 886-A do not explain why the Form 886-A for Mr. Jones identifies seven accounts held jointly by Mr. and Mrs. Jones, while the Form 886-A for Mrs. Jones only identifies four accounts held jointly by Mr. and Mrs. Jones.

(capitalization and emphasis in original). With respect to "Mrs. Jones' Background, Knowledge & Experience," the Form 886-A for Mrs. Jones states:

> By her own admission, Mr. Jones is an educated and knowledgeable woman. She worked as a legal secretary for an estate planning law firm for many years. She maintained the books and gathered tax records for their multiple rental properties. She also made investment decisions and took the initiative to have the family trust amended to include herself as a co-trustee.

(emphasis in original). With respect to "Foreign Accounts Concealed from US Tax Return Preparer," the Form 886-A for Mrs. Jones states:

> Mrs. Jones has gone to the same US tax preparer for 28 years. During each of those years, Mrs. Jones failed to initiate any discussion with her US tax return preparer, Mr. Burke, regarding the existence of her foreign accounts.

> The New Zealand non-resident tax deduction certificates for at least one of Mrs. Jones' New Zealand accounts was mailed to the Jones' residence. These certificates revealed interest income and New Zealand taxes withheld. Those certificates were not disclosed to Mr. Burke.

> The Canadian statement of amounts paid or credited to non-residents of Canada was also mailed to the Jones' residence. These statements reported gross income and zero Canadian taxes withheld. Those statements were also not disclosed to Mr. Burke.

> In her Streamline application, Mrs. Jones states that she was "transparent and openly communicated with the foreign financial and legal advisors regarding the ongoing investments and reinvestments. However, she was clearly NOT transparent or open in her communications with her US CPA. Additionally, she stated during her interview that the [sic] she did not disclose the foreign accounts to her CPA because it was "none of his business." In other words, Mrs. Jones made a deliberate and conscious decision to NOT be transparent or open about her foreign accounts.

(capitalization and emphasis in original). With respect to "Mrs. Jones' Selection of US Tax Return Preparer," the Form 886-A for Mrs. Jones states:

> According to Mrs. Jones, her selection of Mr. Burke as the US tax return preparer was based on a referral from a co-worker at the law firm where she worked. The fact that Mrs. Jones never mentioned the foreign accounts to Mr. Burke because they were "none of his business" indicates that Mrs. Jones' selection of Mr. Burke as the return preparer was not based on his knowledge and experience of the U.S. tax consequences of foreign issues. This is further reinforced by the fact that Mr. Burke is indeed not familiar with FBAR or foreign income reporting requirements.

(emphasis in original). With respect to "<u>Foreign Accounts Concealed from Internal Revenue Service</u>," the Form 886-A for Mrs. Jones states:

> Mrs. Jones' failure to make full disclosure of relevant facts to her return preparer directly resulted in causing her return preparer to prepare false US tax returns and falsely believe that she (Mrs. Jones) did not have an FBAR filing requirement.
>
> Specifically, Mrs. Jones caused her return preparer to check the box "No" in preparing Part III of Form 1040 Schedule B for the years at issue, indicating that Mrs. Jones did not have an interest in or signature or other authority over a foreign financial account.
>
> The ability to respond accurately to that simple, straightforward question on Schedule B does not require a background in tax, finance or accounting matters. Regardless of what Mrs. Jones may have believed regarding foreign taxes withheld or taxability of foreign income to US citizens, she cannot dispute the fact that she knew the correct response to this question was "Yes."
>
> Mrs. Jones admitted that at the completion of the U.S. tax preparation, Mr. Burke would go over <u>everything</u> on the return. He would go through the tax return page by page, line by line, all income and expenses. Mrs. Jones signed each of the tax returns under penalties of perjury, declaring that she examined the return and accompanying schedules and statements, and "to the best of her knowledge and belief, they are true, correct, and complete."

(capitalization and emphasis in original). With respect to "<u>Certifying Statements made by Mrs. Jones on Streamlined Application</u>," the Form 886-A for Mrs. Jones states:

> "I am a Canadian citizen and a U.S. tax resident. I have been residing in the U.S. for many years."
>
> - Mrs. Jones moved to the U.S. on a full time-basis in 1954. At the time she made this statement, she had been living in the U.S. for approximately 60 years, or approximately 70% of her life.
>
> "I was under the belief (which I now realize was a misunderstanding, based upon subsequent legal advice I received) that unless assets are brought to the United States, the income from those foreign assets are not subject to U.S. income taxation and would only be taxed in the foreign country where the income is earned."
>
> - Mrs. Jones received statements of amounts paid or credited to non-resident of Canada on her three Canadian accounts. The statements

indicate gross income was earned but ZERO taxes were withheld. Mr. and Mrs. Jones did not file foreign income tax returns. Income earned was not taxed in the foreign country where the income was earned.

"Neither I, nor my late husband ever spent or withdrew funds from any of the Bank Accounts."

- According to Mrs. Jones' bank records, funds maintained in the Royal Bank of Canada accounts were used to pay expenses incurred in Canada. Royal Bank of Canada statements also reveal cash withdrawals.

"My husband and I had been filing U.S. federal income tax returns for the last several years, but we never reported the interest income generated by the Bank Accounts on those returns based upon our erroneous understanding of how the U.S. tax laws apply to foreign income."

- Canada, New Zealand and United States residents are all required to pay taxes on <u>worldwide</u> income.

"In short, the facts presented above demonstrate that my understanding of the law was a good faith misunderstanding of how United States taxation law applies to assets located in the country of origin of immigrants."

- There is no evidence that Mrs. Jones made any "good faith" effort to understand US tax laws. She did not tell her US return preparer or any other qualified US tax professional.

(capitalization and emphasis in original). Based on these factors, the Form 886-A for Mrs. Jones provides the following analysis:

Mrs. Jones never disclosed to her return preparer of 28 years the fact that she had foreign bank accounts. Mrs. Jones also never disclosed to her return preparer that she had foreign investment income, stating it was "none of his business." In reality, knowing such facts <u>IS</u> a tax return preparer's business.

Mrs. Jones was asked why she checked the box "No" on Schedule B regarding foreign accounts. Mrs. Jones replied, "I must have lied."

As a direct result of Mrs. Jones intentionally concealing this information from her return preparer, a tax return was prepared that excluded this relevant information. Mrs. Jones signed the tax return, acknowledging under penalty of perjury that the tax return was true, correct and complete.

As a direct result of Mrs. Jones intentionally concealing this information from her return preparer, a tax return was prepared that excluded this relevant information. Mrs. Jones signed the tax return, acknowledging under penalty of perjury that the tax return was true, correct and complete.

There is no available evidence that Mrs. Jones knew about FBAR filing requirements. However, the foreign account balances and foreign income were clearly significant enough that the risk of harm for NOT making those disclosures was either known or so obvious that it should have been known.

At best, Mrs. Jones' actions were reckless.

(capitalization and emphasis in original).

In the "CONCLUSION" section, the Form 886-A for Mrs. Jones assesses against Mrs. Jones a willful FBAR penalty which, as noted above, is distinct from the five-percent Miscellaneous Offshore Penalty which had been already paid by Mrs. Jones. (capitalization and emphasis in original). The Form 886-A for Mrs. Jones states that, because the "**Max. Aggregate Balance for ALL Accounts**," meaning both the accounts Mrs. Jones held in her name alone, and also those accounts Mrs. Jones held jointly with Mr. Jones, is greater than $1,000,000.00, the "**Willful Penalty is the GREATER of**" "$100,000 / violation" or "50% of balance at time of violation." (capitalization and emphasis in original). The Form 886-A calculates the willful FBAR penalty at "the statutory maximum of **$1,521,940**. Prorated, **$751,685** for tax year 2011 and **$770,255** for tax year 2012." (emphasis in original). The Form 886-A bases this assessment on the "June 30, 2012 Balance" on all foreign accounts held by Mrs. Jones alone or jointly with her husband, $2,970,499.00, and the "June 30, 2013 Balance" of those same accounts, $3,043,880.00.

On November 21, 2018, Mrs. Jones sent a letter in response to the IRS's assessment of a willful FBAR penalty against her. Rather than protesting the willful FBAR penalty assessment, however, Mrs. Jones stated in her letter a request "that you proceed as soon as possible with assessing the 50% Willful FBAR Penalty you have proposed against Mrs. Jones." The request for an expedited assessment in Mrs. Jones' November 21, 2018 letter was based on the same concerns for Mrs. Jones' health as the September 27, 2018 letter requesting an expedited assessment of the willful FBAR penalty against Mr. Jones. Accordingly, as of November 21, 2018, Mrs. Jones had requested expedited assessment of both willful FBAR penalties assessed against Mr. Jones and herself.

Following Mrs. Jones' letters requesting expedited assessments of the willful FBAR penalties, Mrs. Jones made a partial payment on each of the two willful FBAR penalties, and shortly after making each partial payment, requested a refund thereof. According to plaintiffs' complaint, "[o]n or around December 10, 2018, the Estate of Jeffrey L. Jones submitted a FBAR penalty payment of $4,878.95 for the calendar year 2011, and then on December 11, 2018, a claim for a full refund of the same penalty

payment."[18] Both letters, one enclosing "a check in the amount of **$4,878.95**" as partial payment of the FBAR penalty assessed against Mr. Jones, (emphasis in original), and one seeking a refund of the same amount, are included in the record before the court. Plaintiffs further allege that "[o]n or around April 18, 2019, Mrs. Jones submitted a FBAR penalty payment of $4,972.00 for the calendar years 2011 and 2012, and then on April 19, 2019, a claim for a full refund of the same penalty payment."[19] Both letters, one enclosing "a check in the amount of **$4,972.00**,"[20] which Mrs. Jones explained "one half of which amount is allocable to each of the calendar years at issue (i.e., $2,486 allocable to calendar year 2011, and $2,486 allocable to calendar year 2012)," (emphasis in original), and one seeking a refund of the same amount, are included in the record before the court. In total, Mrs. Jones made partial payments amounting to $9,850.95, against the $3,412,014.00 which Mr. and Mrs. Jones, combined, owed in willful FBAR penalties.

Following the assessment and partial payment of the willful FBAR penalties against Mr. and Mrs. Jones, Mrs. Jones filed complaints in two cases in the United States District Court for the Central District of California. The first complaint was filed on behalf of the estate of Jeffrey L. Jones, <u>Jones v. United States</u>, 19-00173-JVS(RAO), and the parties disagree as to when the complaint was filed, with plaintiffs alleging the complaint was filed on January 1, 2019, and defendant claiming the complaint was filed on January 8, 2019. On the District Court's electronic docket, the complaint in the California District

---

[18] While plaintiffs' complaint identifies the estate of Mr. Jones as having "submitted" the partial payment on the FBAR penalty assessed against Mr. Jones, the check making that partial payment, which appears in the record before the court, is signed by Mrs. Jones, and the letter accompanying the check identifies Mrs. Jones, "in her capacity as the executor of the above-referenced Estate of Jeffrey L. Jones," as the client of the attorney who drafted the letter on her behalf.

[19] Although the reason for making partial payments on the two willful FBAR penalties is not stated in plaintiffs' pleadings or briefs in the above captioned case, in Mrs. Jones' complaints filed in the Federal District Court for the Central District of California, she stated:

> Plaintiff [Mrs. Jones] is informed and believes the "assessment" of an FBAR penalty by the IRS for the failure to timely file an FBAR, and the payment of a portion of such penalty, is a jurisdictional prerequisite for filing this action pursuant to 28 U.S.C. § 1346(a)(2) to contest such determination (*i.e.*, a civil action against the United States to recover amounts erroneously or illegally assessed or collected).

(alteration added).

[20] According to the record before the court, the partial payment of $4,972.00 is not related to a specific foreign account, but rather is a partial payment towards the FBAR penalty assessed against Mrs. Jones for all foreign accounts owned by her alone or jointly with her husband during the tax years 2011 and 2012.

Court case for the estate of Jeffrey Jones indicates filing on January 8, 2019. The second complaint filed in the California District Court was filed by Mrs. Jones in her individual capacity on April 15, 2019, Jones v. United States, 19-04950-JVS(RAO). According to plaintiffs' complaint and defendant's motion to dismiss filed in this court in the above captioned case, the complaints filed in the District Court for the Central District of California sought to recover, on a theory of illegal exaction, the partial payments made on the willful FBAR penalties assessed against Mr. Jones and Mrs. Jones.

The first complaint, in Jones v. United States, Case No. 19-00173, was filed by Mrs. Jones as executor of the estate of Mr. Jones, and that complaint concerned the facts that pertained to the assessment of the willful FBAR penalty against Mr. Jones. The complaint with respect to Mr. Jones asserted one cause of action, a claim for illegal exaction of the partial payment made towards Mr. Jones' willful FBAR penalty. In support of this claim, Mrs. Jones "allege[d] that Jeffrey's failure to file an FBAR for the year 2011 was unintentional and inadvertent, a good faith misunderstanding, and certainly not 'willful' (under any definition or construction of the term 'willfulness')" and that "it was the Joneses' mistaken but good faith belief that they would be subject to U.S. income taxation on such funds only if and when those assets were brought into the United States."

The second complaint, in Jones v. United States, Case No. 19-04950, was filed by Mrs. Jones in her individual capacity, and that complaint concerned the facts that pertained to the assessment of the willful FBAR penalty against Mrs. Jones. The complaint with respect to Mrs. Jones asserted one cause of action, a claim for illegal exaction of the partial payment made towards Mrs. Jones' willful FBAR penalty. In support of her claim, Mrs. Jones made substantially the same allegations as she had with respect to the complaint filed with regard to Mr. Jones, including that the IRS could not find that Mrs. Jones "had actual knowledge of a duty to file an FBAR for certain investment accounts she held individually as well as jointly with Jeffrey in Canada and New Zealand during 2011." Mrs. Jones further alleged, specifically with respect to herself only, that Mrs. Jones "timely mailed an individual FBAR for the year 2012" to satisfy her FBAR requirements for that year. In the complaint with respect to Mrs. Jones, she "allege[d] that her failure to file an FBAR for the year 2011 was unintentional and inadvertent, a good faith misunderstanding, and certainly not 'willful' (under any definition or construction of the term 'willfulness')," and reiterated that "it was the Joneses' mistaken but good faith belief that they would be subject to U.S. income taxation on such funds only if and when those assets were brought into the United States."

As plaintiffs recount in their current complaint filed in the United States Court of Federal Claims, "[t]he government filed answers and brought counterclaims" in the cases filed in the Federal District Court in California, defending the assessment of the willful FBAR penalties and seeking judgment on the unpaid balance of the FBAR penalties assessed against Mr. and Mrs. Jones. Thereafter, cross-motions for summary judgement were filed in both plaintiff-initiated cases in the California District Court by Mrs. Jones and the government. In both of those California District Court cases, Mrs. Jones moved for summary judgment on the theory that the evidence did not support the determination by the IRS of willfulness for Mr. or Mrs. Jones. Mrs. Jones argued that the IRS's determination

had been arbitrary and capricious. See Jones v. United States, No. 19-00173, 2020 WL 4390390, at *6 (C.D. Cal. May 11, 2020); Jones v. United States, No. 19-04950, 2020 WL 2803353, at *6 (C.D. Cal. May 11, 2020). The government also moved for summary judgment in those two California District Court cases, on the grounds that the IRS's willfulness determinations for Mr. and Mrs. Jones had been correct and that the assessed FBAR penalties had been within the statutory maximum. See Jones v. United States, 2020 WL 4390390, at *8-10; Jones v. United States, 2020 WL 2803353, at *9-11. With respect to both Mr. and Mrs. Jones, the District Court determined that the "evidence create[d] a genuine dispute of material fact as to whether" Mr. and Mrs. Jones "engaged in a willful violation," and, therefore, the District Court denied Mrs. Jones' motions for summary judgment with respect to the issue of willfulness. Jones v. United States, 2020 WL 4390390, at *8; Jones v. United States, 2020 WL 2803353, at *8. The District Court denied in full Mrs. Jones' motion for summary judgment in the case regarding Mr. Jones, and granted in part and denied in part Mrs. Jones' motion for summary judgment in the case regarding Mrs. Jones. See Jones v. United States, 2020 WL 4390390, at *8; Jones v. United States, 2020 WL 2803353, at *9. The District Court denied the government's cross-motions for summary judgment on the issue of willfulness because a genuine dispute of material fact existed, see Jones v. United States, 2020 WL 4390390, at *10; Jones v. United States, 2020 WL 2803353, at *10, but the District Court granted the government's cross-motions for summary judgment on the issue of whether the willful FBAR penalties were assessed within the statutory maximum. See Jones v. United States, 2020 WL 4390390, at *10; Jones v. United States, 2020 WL 2803353, at *11. In the case concerning the IRS's assessment of a willful FBAR penalty against Mrs. Jones the District Court granted summary judgment to Mrs. Jones on one issue: that the IRS had arbitrarily and capriciously calculated the willful FBAR penalty against Mrs. Jones by considering both tax years 2011 and 2012. See Jones v. United States, 2020 WL 2803353, at *8. The Federal District Court in California concluded that since "Mrs. Jones filed a timely, but incomplete FBAR for 2012," the FBAR penalty "should have been calculated with only the 2011 year as the base," and including the year 2012, therefore, had been arbitrary and capricious. Id. Whether the IRS had arbitrarily and capriciously calculated Mr. Jones' FBAR penalty was not at issue, because the IRS had only assessed an FBAR penalty against Mr. Jones with respect to 2011.

Following the California Federal District Court's rulings on the cross-motions for summary judgment, the United States filed its own complaint, United States v. Jones, Case No. 2:20-cv-06173-JVS(RAO), seeking to bring to judgment the willful FBAR penalties assessed against Mr. and Mrs. Jones. According to defendant, the United States'

> affirmative suit was filed to ensure that the district court properly had jurisdiction given the possibility under *Bedrosian v. United States* that the FBAR penalty might be subject to the *Flora* full-payment rule, *see Bedrosian v. United States*, 912 F.3d 144, 149-50 and n.1 (3d Cir. 2018), and the Ninth Circuit's decision in *Boynton v. United States*, which provides that the government should initiate suits when there has not been full payment of the taxes, *see Boynton v. United States*, 566 F.2d 50, 56 (9th Cir. 1977).

According to defendant's supplemental brief, "[t]his third suit [in the Federal District Court in California] did not involve any new issues beyond those raised in the suits filed by Mrs. Jones." (alterations added).

The three District Court cases were subsequently consolidated, and jury trials of the cases were twice scheduled before the orders for trial were vacated at the onset of the coronavirus pandemic. Thereafter, Mrs. Jones and the government entered into an agreement to settle all three District Court cases, and according to plaintiffs' complaint in this court, "Mrs. Jones ultimately made a large settlement payment in excess of $1M in December 2020" to resolve Mr. and Mrs. Jones' FBAR liabilities. Defendant's supplemental brief filed in the above captioned case indicates that Mrs. Jones settled the FBAR penalties assessed against both Mr. and Mrs. Jones for "$1.3 million," although defendant indicates that "[a]t the time of the settlement, the total FBAR penalties owned [sic], including interest and penalties, was $2,967,365." According to defendant's motion to dismiss in the case currently before this court, on December 21, 2020, Mrs. Jones and the government filed stipulations to dismiss the complaints filed in the California District Court, as well as the government's counterclaims. The three California District Court suits were terminated on December 21, 2020.

Only after defendant's motion to dismiss in the United States Court of Federal Claims was under consideration, did the court uncover the settlement of, and the potential relationship of, the District Court proceedings to the more recent case filed in this court. The parties were asked to address the significance of the three cases filed in the California District Court, including any overlap between the cases in the District Court and the issues presented in the above captioned case. Both defendant and plaintiffs assert that the issues presented in the California District Court cases were distinct from the issues currently presented in the above captioned case in the United States Court of Federal Claims. In its supplemental brief, defendant argues that "[t]he issue in the suits filed in the Central District of California was whether Mr. and Mrs. Jones were willful in their failure to file FBARs reporting their foreign bank accounts to the Department of the Treasury." Defendant argues that the above captioned case is limited to the question of "whether plaintiffs are entitled to a refund of the Title 26 Miscellaneous Offshore Penalty ('MOP'), which is a penalty assessed and collected by the IRS separate from the FBAR penalty." Defendant argues that in the above captioned case, "neither Mr. Jones's nor Mrs. Jones's willfulness is relevant or material to the Court's resolution of this case," and states "to the extent Form 14654 constitutes a contract between Mrs. Jones and the United States, the only issue for this Court to determine is whether the IRS had *evidence* of willful conduct to open an examination of FBAR compliance." (emphasis in original). In their supplemental brief in this court, plaintiffs also differentiate between the issues presented in the California Federal District Court cases and the issues in the above captioned case. Plaintiffs describe the issue presented in the California District Court cases as "whether the penalties of $3,411,984 were correctly assessed by the government against Mrs. Jones and the Estate of Mr. Jones. Including the analysis of whether there was or there was no willful blindness in the Jones' failure to file FBARs reporting foreign bank accounts." By contrast, plaintiffs describe the issue in the above

captioned cases as whether the "contract was later breached by the government when it subsequently assessed other penalties in a total amount of $3,411,984 without a determination of whether Mrs. Jones had a 'good faith misunderstanding of the law.'" Plaintiffs state that "[t]he [California District] Court never made a determination of willfulness by Mrs. Jones. Nor did the District Court made [sic] a determination whether Mrs. Jones had a 'good faith misunderstanding of the law,' which is the crux of this current case." (alterations added). Plaintiffs further state with respect to the above captioned case:

> the plaintiff [sic] seeks to get a refund of the $156,795 paid to the government in accordance with the contract entered into with the government. This, because of a breach by the government since at no time was there a finding that Mrs. Jones did not have a "good faith misunderstanding of the law."

## DISCUSSION

Margaret J. Jones died on March 11, 2021. Plaintiffs, the executors of her estate, filed their complaint in this court on April 13, 2021, seeking recovery of the Miscellaneous Offshore Penalty amounts paid by Mrs. Jones "which have no statutory authority and do not exist in the law and were illegally exacted or taken from the Plaintiff, and more specifically Margaret J. Jones prior to her death, in contravention of statutes of the United States." The executor plaintiffs were not parties to the three earlier California Federal District Court cases since Margaret Jones had passed on March 11, 2021, after the three California Federal District Court cases had been settled. In the case currently before this court, it appears that plaintiffs seek only to recover the $156,795.26 Miscellaneous Offshore Penalty paid by Mrs. Jones as part of her participation in the IRS Streamlined Procedures described above.[21] Plaintiffs allege: "the 5% MOP was collected and illegally exacted without any authority in the law or any statute. Such a penalty does not exist in any statute; not Title 26 and not Title 31."

Plaintiffs' complaint seeks recovery of the Miscellaneous Offshore Penalty on two distinct theories, each expressed as alternative causes of action. The first, "**COUNT I – BREACH OF CONTRACT**," alleges that

> [t]he IRS made an offer to Mrs. Jones, she accepted the offer and paid the IRS consideration of $156,795.26 along with signing a verified statement of

---

[21] As discussed below, in support of their breach of contract claim, plaintiffs challenge the IRS's assessment of a willful FBAR penalty against Mrs. Jones. Plaintiffs do not seek to recover the amount of the willful FBAR penalty paid by Mrs. Jones, however, which Mrs. Jones previously sought to recover in her suit brought in her individual capacity against the United States in the Federal Central District of California, Jones v. United States, Case No. 19-4590. Instead, the damages claimed in plaintiffs' complaint reflects only the amount paid by Mrs. Jones as the Miscellaneous Offshore Penalty.

> non-willfulness. The government then breached the contract by assessing FBAR penalties under a "willful blindness" theory, far above the 5% MOP agreed to penalty amount.

(capitalization and emphasis in original). Plaintiffs argue that the Form 14654 contains the terms of a contract between Mrs. Jones and the IRS, and that when the IRS assessed willful FBAR penalties against Mrs. Jones, "the IRS breached the terms of their contract not to assert other penalties which they did, in a total amount of $3,411,984; which cost her [Mrs. Jones] dearly in attorney fees for litigation brought in the U.S. District Court." (alteration added). As noted, plaintiffs do not seek to recover the FBAR payments made by Mrs. Jones; rather, as plaintiffs state, "[t]he remedy of the estate of the late Mrs. Jones should be the recovery of the $156,795."

Plaintiffs' second cause of action, "**COUNT II – ILLEGAL EXACTION**," alleges that "[t]here is no legal or statutory authority for" the Miscellaneous Offshore Penalty paid by Mrs. Jones upon entry into the Streamlined Procedures. (capitalization and emphasis in original). Plaintiffs argue that while "[t]he IRS refers to the 5% MOP paid by Mrs. Jones as a 'Title 26 miscellaneous offshore penalty,'" the Miscellaneous Offshore Penalty "is nowhere to be found in any statute, not in Title 26 or Title 31." Accordingly, plaintiffs seek the return of the $156,795.26 paid to the IRS by Mrs. Jones. Plaintiffs' illegal exaction claim, unlike the breach of contract claim, does not challenge the assessment of the willful FBAR penalty against Mrs. Jones, but rather argues that the Miscellaneous Offshore Penalty payment made by Mrs. Jones must be returned solely on the basis that no statutory authority exists for the Miscellaneous Offshore Penalty.

Plaintiffs describe their request for relief as follows:

1.    For judgment in the amount of $156,795.26 having been illegally exacted from Plaintiff (and/or for a breach of contract by Defendant);

2.    For pre and post-judgment interest as allowed by law;

3.    For attorneys' fees and all costs of suit herein occurred; and

4.    For such other further relief as the Court may deem just and proper.

## Count I – The Contract Claim

As noted above, defendant filed a motion to dismiss plaintiffs' complaint pursuant to RCFC 12(b)(1) and 12(b)(6), which has been fully briefed. With respect to Count One, defendant argues that "plaintiffs have failed to state a claim for breach of contract because Mrs. Jones's submission of Form 14654 did not create a contract with the IRS, and even if it had, the IRS did not breach the purported contract."[22]

---

[22] Defendant also contends in a footnote that "Plaintiffs' allegation that Mrs. Jones was induced into paying the MOP to avoid an income tax or FBAR audit may be construed as

When examining what must be pled in order to state a claim, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2021); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Supreme Court has stated:

> While a complaint attacked by Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid. [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. Of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure §1216 pp. 235-236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim that relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570); First Mortg. Corp. v. United States, 1961 F.3d 1331, 1339 (Fed. Cir. 2020); Am. Bankers Ass'n v. United States, 932 F.3d 1375, 1380 (Fed. Cir. 2019); Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied, (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 562 U.S. 830 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely

---

one for promissory estoppel," and that "the Court of Federal Claims lacks jurisdiction to hear claims based on promissory estoppel." (citing Durant v. United States, 16 Cl. Ct. 447, 450 (1988)). This argument is not further addressed in either party's briefs.

consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009); Christen v. United States, 133 Fed. Cl. 226, 229 (2017); Christian v. United States, 131 Fed. Cl. 134, 144 (2017); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Hous. Corp. v. United States, 113 Fed. Cl. 244, 253 (2013), aff'd, 579 F. App'x 1004 (Fed. Cir. 2014); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726-27 (2010); Legal Aid Soc'y of N.Y. v. United States, 92 Fed. Cl. 285, 292, 298 n.14 (2010).

When deciding a case based on a failure to state a claim, the court "must accept as true the factual allegations in the complaint." Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1355 (Fed. Cir. 2011); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002)))); Scheuer v. Rhodes, 416 U.S. at 236 ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); Am. Bankers Ass'n v. United States, 932 F.3d at 1380 ("In reviewing a motion to dismiss, we accept as true the complaint's well-pled factual allegations; however, we are not required to accept the asserted legal conclusions." (citing Ashcroft v. Iqbal, 556 U.S. at 678)); Harris v. United States, 868 F.3d 1376, 1379 (Fed. Cir. 2017) (citing Call Henry, Inc. v. United States, 855 F.3d 1348, 1354 (Fed. Cir. 2017)); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

With respect to the question raised by plaintiffs in Count One regarding the existence of a contract, defendant argues that "simply put, Form 14654 is not a contract with the United States" and that "plaintiffs have failed to allege the basic elements of contract formation." Moreover, according to defendant, "the IRS did not intend to be bound by Mrs. Jones's self-certification of non-willfulness," and "the IRS left open the ability to conduct a complete examination and investigation of" Mrs. Jones. Privity of contract between a plaintiff and the United States government is required to bring a cause of action in the United States Court of Federal Claims for express and implied contracts. See Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998) ("Under

the Tucker Act, the Court of Federal Claims has jurisdiction over claims based on 'any express or implied contract with the United States.' 28 U.S.C. § 1491(a)(1) (1994); We have stated that '[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government.' Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990)."), cert. denied, 528 U.S. 820 (1999); see also Authentic Apparel Grp., LLC v. United States, 989 F.3d 1008, 1012 (Fed. Cir. 2021); Estes Exp. Lines v. United States. 739 F.3d 689, 693 (Fed. Cir. 2014); Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1265 (Fed. Cir. 2005) (The "government consents to be sued only by those with whom it has privity of contract."); S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1328 (Fed. Cir.) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim," but noting exceptions to this general rule (citing Anderson v. United States, 344 F.3d 1343, 1352 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); United States v. Algoma Lumber Co., 305 U.S. 415, 421 (1939))), reh'g and reh'g en banc denied (Fed. Cir. 2005), cert. denied, 548 U.S. 904 (2006); Erickson Air Crane Co. of Wash. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984) ("The government consents to be sued only by those with whom it has privity of contract.").

To have privity of contract with the United States government, and, therefore, to invoke jurisdiction in the United States Court of Federal Claims for an alleged breach of contract claim, plaintiff "must show that either an express or implied-in-fact contract underlies [the] claim." Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997); see also Park Props. Assocs., L.P. v. United States, 916 F.3d 998, 1002 (Fed. Cir. 2019), cert. denied, 140 S. Ct. 857 (2020). "An express contract '"must be manifested by words, either oral or written which contains agreement and/or mutual assent."'" Frankel v. United States, 118 Fed. Cl. 332, 335 (2014) (quoting Essen Mall Props. v. United States, 21 Cl. Ct. 430, 439 (1990), aff'd, 842 F.3d 1246 (Fed. Cir. 2016) (quoting Webster University v. United States, 20 Cl. Ct. 429, 433 (1990))).

The elements for both express and implied contracts with the United States are identical. See Night Vision Corp. v. United States, 469 F.3d 1369, 1375 (Fed. Cir. 2006) ("The elements of an implied-in-fact contract are the same as those of an oral express contract."), cert. denied, 550 U.S. 934 (2007); Hanlin v. United States, 316 F.3d 1325, 1328 (Fed. Cir. 2003) ("Thus, the requirements for an implied-in-fact contract are the same as for an express contract; only the nature of the evidence differs."); City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998). The required elements to demonstrate an express or implied contract are: "(1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance," and (4) "[t]he government representative whose conduct is relied upon must have actual authority to bind the government in contract." Id. (citing City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990), cert. denied, 501 U.S. 1230 (1991)); see also Columbus Reg'l Hosp. v. United States, 990 F.3d 1330, 1339 (Fed. Cir. 2021); Yifrach v. United States, 145 Fed. Cl. 691, 698 (2019), appeal filed, No. 20-1535 (Fed. Cir. Mar. 6, 2020); Bank of Guam v. United States, 578 F.3d at 1326 (quoting Trauma Serv. Grp. v. United States, 104 F.3d at 1325); see also Chattler v. United States, 632 F.3d 1324, 1330 (2011) (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1325); Hanlin v. United States, 316 F.3d

at 1328 (citing City of Cincinnati v. United States, 153 F.3d at 1377)); Edwards v. United States, 22 Cl. Ct. 411, 420 (1991) (citing Essen Mall Props. v. United States, 21 Cl. Ct. at 440; Pac. Gas & Elec. Co. v. United States, 3 Cl. Ct. 329, 339 (1983), aff'd, 738 F.2d 452 (Fed. Cir. 1984); and City of Klawock v. United States, 2 Cl. Ct. 580, 584 (1983), aff'd, 732 F.2d 168 (Fed. Cir. 1984)); see also Total Med. Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir.) ("The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." (citations omitted)), reh'g and reh'g en banc suggestion denied (Fed. Cir.), cert. denied, 522 U.S. 857 (1997); City of Cincinnati v. United States, 153 F.3d at 1377; San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989); Stanwyck v. United States, 127 Fed. Cl. 308, 312 (2016); Huntington Promotional & Supply, LLC v. United States, 114 Fed. Cl. 760, 767 (2014); Eden Isle Marina. Inc. v. United States, 113 Fed. Cl. 372, 492 (2013); Council for Tribal Emp't Rights v. United States, 112 Fed. Cl. 231, 243 (2013), aff'd, 556 F. App'x 965 (2014); Biofunction, L.L.C. v. United States, 92 Fed. Cl. 167, 172 (2010); Mastrolia v. United States, 91 Fed. Cl. 369, 384 (2010) (citing Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1265 (2005)); see also Trauma Serv. Grp. v. United States, 104 F.3d at 1325; Weeks v. United States, 124 Fed. Cl. 630, 633 (2016); Vargas v. United States, 114 Fed. Cl. 226, 233 (2014); Prairie Cnty., Mont. v. United States, 113 Fed. Cl. 194, 202 (2013), aff'd, 782 F.3d 685 (Fed. Cir.), cert. denied, 136 S. Ct. 319 (2015); California Human Dev. Corp. v. United States, 87 Fed. Cl. 282, 293 (2009), aff'd, 379 F. App'x 979 (Fed. Cir. 2010); Aboo v. United States, 86 Fed. Cl. 618, 629, aff'd, 347 F. App'x 581 (Fed. Cir. 2009); SGS-92-X003 v. United States, 74 Fed. Cl. 637, 653-54 (2007); Arakaki v. United States, 71 Fed. Cl. 509, 514 (2006), aff'd, 228 F. App'x 1003 (Fed. Cir. 2007); Fincke v. United States, 230 Ct. Cl. 233, 243-44, 675 F.2d 289, 295 (1982); Russell Corp. v. United States, 210 Ct. Cl. 596, 608-09 (1976). It is key to contract formation with the government that, "[t]he law requires that a Government agent who purports to enter into or ratify a contractual agreement that is to bind the United States have actual authority to do so." Monarch Assurance P.L.C. v. United States, 244 F.3d 1356, 1360 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001) (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1325). "The corollary is that any party entering into an agreement with the Government accepts the risk of correctly ascertaining the authority of the agents who purport to act for the Government . . . ." Id. (citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); see also Snyder & Assocs. Acquisitions LLC v. United States, 133 Fed. Cl. 120, 126 (2017).

In this court, plaintiffs allege that the Form 14654 constituted an offer from the government to Mrs. Jones, which Mrs. Jones accepted by completing and submitting the Form 14654, and for which Mrs. Jones allegedly paid consideration to the government in the amount of $156,795.26, as a Miscellaneous Offshore Penalty. In return, plaintiffs allege, the government promised "not to assert other penalties" against Mrs. Jones for "failure to report foreign financial assets" on her prior tax returns.

According to defendant, the "Form 14654 is not a contract with the United States" and that "[b]y leaving open the IRS's ability to examine a taxpayer and impose penalties

beyond the MOP, the IRS did not intend to be bound by Mrs. Jones's representations," with respect to willfulness. Defendant states, "a contract between Mrs. Jones and the IRS was not formed," and "the plain language of the form that Mrs. Jones signed and submitted indicates that the [sic] Mrs. Jones's self-certification of non-willfulness was subject to the potential for examination and additional penalties," including a later determination as to whether or not Mrs. Jones' failures to report had been willful. As stated in the Form 14654, by her signature Mrs. Jones "recognize[d] that if the Internal Revenue Service receives or discovers evidence of willfulness, fraud, or criminal conduct, it may open an examination or investigation that could lead to civil fraud penalties," including regarding FBAR penalties. Defendant states that "following the submission of Form 14654, the IRS retained the discretion to examine a taxpayer and assess additional penalties." Therefore, defendant argues, "the IRS's ability to change the terms or end it at its own discretion, indicates that the IRS did not intend to be bound by the mere submission of a Form." (capitalization in original) (citing Landgraf v. United States, 151 Fed. Cl. 326, 334 (2020)).

Defendant argues that "[w]here the Streamlined Procedures leave open that a taxpayer's submissions are subject to review, examination, and potential penalties is insufficient to constitute an offer." In support, defendant quotes from a United States Court of Claims case and two United States Claims Court cases, which were affirmed by the United States Court of Appeals for the Federal Circuit: Cutler-Hammer, Inc. v. United States, 441 F.2d 1179, 194 Ct. Cl. 788 (1971), Last Chance Mining Co. v. United States, 12 Cl. Ct. 551 (1987), aff'd, 846 F.2d 77 (Fed. Cir. 1988) (unpublished table decision), and Girling Health Systems, Inc. v. United States, 22 Cl. Ct. 66 (1990), aff'd, 949 F.2d 1145 (Fed. Cir. 1991). In each of the cases cited by defendant, the claimants argued that a government program constituted an offer to contract and that, by submitting documentation required to participate in the programs at issue, the claimants had accepted an offer from the government and created an enforceable contract. In Cutler-Hammer, government regulation provided for an application process to purchase silver from the United States. Despite completing the necessary applications, the claimants were not approved to purchase silver. See Cutler-Hammer, Inc. v. United States, 194 Ct. Cl. at 793-94. The Court of Claims in Cutler-Hammer found that "[p]urchasers are simply invited to make 'application' to buy certain quantities of silver," which "applications were in turn subject to the approval of the Director of Domestic Gold and Silver Operations . . . ." Id. at 794. The court determined that "[i]t requires a distortion of plain English to infer that making an application in conformity with the terms of this Regulation would constitute an acceptance of an offer whereby the United States intended to bind itself." Id. at 795. As the Court of Claims explained, "[t]he only effort to be expended by these plaintiffs was to fill in the blanks of a Government prepared form. They were not invited to accept by performance." Id. at 796. In Girling Health Systems, a corporate plaintiff brought a claim for breach of contract on the grounds that the plaintiff had completed an IRS application to change corporate status in exchange for the government's promise to notify plaintiff within 60 days of the acceptance or rejection of the application, and the government failed to meet that deadline. Girling Health Sys., Inc. v. United States, 22 Cl. Ct. at 69. The court in Girling Health Systems stated "that mere solicitations, invitations or instructions from the Government are not offers to contract that bind the Government upon plaintiff's

completion of a form, even when the solicitations, invitations or instructions are embodied in a statute or regulation." Id. at 72. In Last Chance Mining Co., a corporation which "owned a fifty percent interest in unpatented lode mining claims" sought to comply with the requirements of the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701-82, to record its interests in the mining claims. Last Chance Min. Co. v. United States, 12 Cl. Ct. at 552-53. Pursuant to the statutory requirements for recording its interests, the corporation sent the Bureau of Land Management "(a) a statement of ownership; (b) a plot or map delineating the claims; and (c) a supplemental claim map of the Pioneer claims, Copper Basic Area in Bald Mountain." Last Chance Min. Co. v. United States, 12 Cl. Ct. at 553. The plaintiff in Last Chance Mining sued for breach of contract when the government's alleged failure to file plaintiff's documents resulted in the loss of plaintiff's interest to a competitor. See id. at 555. In Last Chance Mining, the court rejected plaintiff's argument that the filing requirements constituted an offer to contract, stating:

> The statutes and regulations here in question do not purport, even by implication, to constitute an offer. While in the broadest sense, the FLPMA is an "offer" to allow proof of claims, it is certainly not an offer to *contract*. It is more accurately characterized as a unilateral ultimatum on the part of the Government. It would do violence to traditional contract theory, not to mention the operation of government, to hold that any statute requiring some action by a citizen to obtain a benefit or protect a right constituted an open offer to contract. The court concludes that Last Chance does not state facts upon which a contract can be predicated.

Last Chance Min. Co. v. United States, 12 Cl. Ct. at 556 (emphasis in original; footnote omitted). Although instructive, the facts and conclusions of the cases relied upon by defendant differ from Mrs. Jones' dealings with the IRS. As noted above, the Form 14654 which Mrs. Jones signed, by its own terms, did not commit the IRS to accepting an applicant's representations of that person's own determination of a lack of willfulness as a final determination of liability and included a provision stating the IRS could conduct further examination of Mrs. Jones regarding willfulness.

Plaintiffs, however, respond that all four elements required to allege a contract with the government are present in the allegations in their complaint and the facts related to Mrs. Jones' participation in the IRS's Streamlined Procedures. Plaintiffs state:

> (1) both the government and the taxpayer intended to enter into this agreement, the government set forth Form 14654 and Mrs. Jones agreed to the specific terms; (2) with Form 14654 and the SFCP [Streamlined Procedures] the government established an offer and by completing and signing such Form, Mrs. Jones accepted the offer; (3) the agreement itself states that "in consideration of the IRS's agreement not to assert other penalties" Mrs. Jones consented to immediate assessment and collection of the MOP, she paid $156,795.26; and (4) the IRS issued Form 14654 under the powers the IRS has to "administer, manage, conduct, direct and

supervise the execution and application of the internal revenue laws," to create programs like the SFCP.

(quoting I.R.C. § 7803(a)(2)(A)). Further, plaintiffs, choosing to acknowledge only certain words of the agreement and to ignore others, argue that "[w]hile it is true that Form 14654 subjects the agreement to the possibility that the IRS may conduct a full examination of a taxpayer who used the procedure, this is merely another term of the contract." According to plaintiffs, rather than preventing proper consideration sufficient to support the contract, the government's reservation of examination "merely provides another condition of the contract and as part of the consideration, the taxpayer is to not have committed willful, fraudulent or criminal conduct," which plaintiffs argue that Mrs. Jones did not do.

As stated above, contract formation "requires (1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance," City of Cincinnati v. United States, 153 F.3d at 1377, as well as (4) "[t]he government representative whose conduct is relied upon must have actual authority to bind the government in contract." Id. The language of the Form 14654, upon which plaintiffs rely to argue for the existence of a contract, and which Mrs. Jones signed, explicitly states:

> In consideration of the Internal Revenue Service's agreement not to assert other penalties with respect to my failure to report foreign financial assets as required on FBARs or Forms 8938 or my failure to report income from foreign financial assets, I consent to the immediate assessment and collection of a Title 26 miscellaneous offshore penalty for the most recent of the three tax years for which I am providing amended income tax returns.

The specific language of Form 14654 by its terms explicitly reserves the ability for the IRS to conduct further examination and assess additional penalties if Mrs. Jones' behavior was found to be willful after examination. When Mrs. Jones signed the Form 14654, she also agreed to the following language included in the Form 14654, which states: "I recognize that if the Internal Revenue Service receives or discovers evidence of willfulness, fraud, or criminal conduct, it may open an examination or investigation that could lead to civil fraud penalties, FBAR penalties, information return penalties, or even referral to Criminal Investigation." (capitalization in original). Moreover, the Form 14654 explicitly reserves to the IRS the right to conduct such an examination and assess further penalties without regard to the previous amount paid as the Miscellaneous Offshore Penalty and without indicating in the Form 14654 the amount or extent as to which penalties may be assessed following such an examination and finding of willfulness. Moreover, while the Form 14654 requires the applicant to make representations to the IRS regarding the applicant's willfulness in failing to report foreign financial assets, the IRS's reservation of the right to further examine the conduct of the applicant does not bind the IRS to the applicant's representations.

The terms of the Form 14654 indicate that mutual intent to enter into a binding, final contract was not present between the IRS and Mrs. Jones. Mutual intent to contract requires "the existence of an offer and a reciprocal acceptance," Anderson v. United

<u>States</u>, 344 F.3d at 1353, an offer, in turn, shown by "'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" <u>Id.</u> (quoting <u>Restatement (Second) of Contracts</u> § 24 (1981)). By providing in the Form 14654 that the IRS could "open an examination" into Mrs. Jones, with the explicit possibility of assessing FBAR penalties as a result, the IRS reserved its right to conduct an examination and assess further penalties after Mrs. Jones' completion of the Form 14654. This reservation does not evidence a "'manifestation of willingness to enter into a bargain'" with finality on behalf of the IRS, nor does it "'justify'" Mrs. Jones' belief, as alleged by plaintiffs, that her "'assent'" had "'conclude[d]'" such a "'bargain,'" <u>id.</u> (quoting <u>Restatement (Second) of Contracts</u> § 24 (1981)), binding the IRS "not to assert other penalties," as alleged in plaintiffs' complaint.

With respect to the element of consideration, the terms of the Form 14654 which Mrs. Jones signed indicate that, rather than bargaining for a final exchange at the time Mrs. Jones paid the penalty, Mrs. Jones "recognize[d] that if the" IRS were to "discover[] evidence of willfulness, fraud, or criminal conduct," the IRS could "open an examination or investigation" of Mrs. Jones' tax liabilities and assets for potential penalties, including FBAR penalties. The language of the Form 14654 indicates that rather than a binding "agreement not to assess other penalties," as alleged by plaintiffs, the IRS gave Mrs. Jones the opportunity to try to resolve her tax obligations with limited penalties as a result of her failure to report foreign bank accounts, but the IRS did not renounce a later possible penalty for an examination into and a finding of "willfulness, fraud, or criminal conduct" on the part of Mrs. Jones. Plaintiffs, therefore, cannot demonstrate that the penalty Mrs. Jones had previously paid as the Miscellaneous Offshore Penalty constituted sufficient consideration necessary to support a contract with the IRS under the terms of the Form 14654. Because plaintiffs in the case currently before the court have not alleged the elements of either mutual intent to contract or consideration, plaintiffs have not demonstrated the requirements of a contract with the United States. Accordingly, the court dismisses Count One of plaintiffs' complaint alleging breach of contract for failure to state a claim.

Defendant further maintains that even if Mrs. Jones had entered into a contract with the government, "plaintiffs have failed to identify a breach of the purported contract." The question of breach of contract is one of contract interpretation. "Contract interpretation starts with the language of the contract." <u>SUFI Network Servs., Inc. v. United States</u>, 785 F.3d 585, 593 (Fed. Cir. 2015); <u>see also</u> <u>NOAA Maryland, LLC v. Adm'r of Gen. Servs. Admin.</u>, 997 F.3d 1159, 1165 (Fed. Cir. 2021); <u>Authentic Apparel Grp., LLC v. United States</u>, 989 F.3d at 1014; <u>Premier Office Complex of Parma, LLC v. United States</u>, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (citing <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004)); <u>Precision Pine & Timber, Inc. v. United States</u>, 596 F.3d 817, 824 (Fed. Cir. 2010), <u>cert. denied</u>, 562 U.S. 1178 (2011); <u>Bell/Heery v. United States</u>, 739 F.3d at 1331; <u>LAI Servs., Inc. v. Gates</u>, 573 F.3d 1306, 1314 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2009); <u>Barron Bancshares, Inc. v. United States</u>, 366 F.3d 1360, 1375 (Fed. Cir. 2004); <u>Foley Co. v. United States</u>, 11 F.3d 1032, 1034 (Fed. Cir. 1993); <u>HCIC Enters., LLC v. United States</u>, 147 Fed. Cl. 118, 124 (2020); <u>Nw. Title Agency, Inc. v. United States</u>, 126 Fed. Cl. 55, 57-58 (2016) (citing <u>Foley Co. v. United</u>

States, 11 F.3d at 1034) ("The starting point for any contract interpretation is the plain language of the agreement."), aff'd, 855 F.3d 1344 (Fed. Cir. 2017); Beard v. United States, 125 Fed. Cl. 148, 158 (2016); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. at 483-84.

"""In contract interpretation, the plain and unambiguous meaning of a written agreement controls.""" Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991))). "Terms must be given their plain meaning if the language of the contract is clear and unambiguous." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593 (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); see also Canpro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 347, recons. denied, 131 Fed. Cl. 528 (2017); Beard v. United States, 125 Fed. Cl. at 158 ("If the contract language is unambiguous, then it must be given its plain and ordinary meaning . . . ."). The United States Court of Appeals for the Federal Circuit stated in Massie v. United States:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (quoting McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1996) (internal citations omitted)); Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435; and Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998)); Harris v. Dep't of Veterans Affairs, 142 F.3d at 1467; see also Coast Prof'l, Inc. v. United States, 828 F.3d 1349, 1354 (Fed. Cir. 2016); Shell Oil Co. v. United States, 751 F.3d 1282, 1305 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014); McHugh v. DLT Sols., Inc., 618 F.3d 1375, 1380 (Fed. Cir. 2010); Giove v. Dep't of Transp., 230 F.3d 1333, 1340-41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." (citations omitted)); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"). A Judge of the United States Court of Federal Claims has explained:

> "The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties." Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322

(Fed. Cir. 1997). "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent." <u>Abraham v. Rockwell Int'l Corp.</u>, 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony. . . . [T]he provisions must be read together in order to implement the substance and purpose of the entire agreement." <u>Air-Sea Forwarders, Inc. v. United States</u>, 166 F.3d 1170, 1172 (Fed. Cir. 1999). "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." <u>Medlin Const. Grp., Ltd. v. Harvey</u>, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

<u>Dynetics, Inc. v. United States</u>, 121 Fed. Cl. 492, 512 (2015); <u>see</u> <u>also</u> <u>Marquardt Co. v. United States</u>, 101 Fed. Cl. 265, 269 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)).

While plaintiffs' Count One alleges that the United States breached its contract with Mrs. Jones, plaintiffs' complaint is unclear as to the exact nature of the alleged breach. In particular, plaintiffs' complaint does not specify whether the United States breached its contract with Mrs. Jones by assessing a willful FBAR penalty against Mrs. Jones or whether the United States breached its contract by assessing willful FBAR penalties against both Mr. and Mrs. Jones. Plaintiffs' allegations relating to the claimed breach of contract largely relate to Mrs. Jones' alleged "good faith misunderstanding of the law" or lack of willfulness. The complaint states:

> The government lured Mrs. Jones in based upon the IRS promise and the explicit provisions of the contract, that by its terms required some error of the taxpayer to be reflected on the tax return, a failure to report foreign financial assets. They then later switched their position and alleged her good faith misunderstanding of the law was irrelevant and she should be strictly liable for other "willfully blind" penalties beyond the 5% MOP penalty set forth in the contract.

The complaint further states:

> The government breached its contract with Mrs. Jones by subsequently finding after a very long and detailed income tax and FBAR audit that although the government actually owed a refund of income tax of $15,872.00[23] to Mrs. Jones (and the IRS found no Title 26 penalties of any

---

23 In both the complaint and in plaintiffs' response to defendant's motion to dismiss, plaintiffs refer to a "tax refund" "for the tax year 2013 of $15,872.00" at multiple points. This tax refund, which appears to have been paid by the IRS to Mrs. Jones, is not otherwise documented in the record before the court and, in the record before the court, does not appear to be related to the willful FBAR penalty assessed against Mr. Jones,

kind were applicable); the government nevertheless assessed **_other_ _penalties_** in a total amount of $3,411,984. In assessing these Title 31 penalties, the government breached the terms of their own contract by later asserting Mrs. Jones's good faith misunderstanding of the law (an exacting requirement of the written terms of the contract) was irrelevant; *i.e.*, her " *. . . negligence, inadvertence, or mistake or conduct that [was] . . . the result of [her] a good-faith misunderstanding of the law . . .*"; " *. . . **is irrelevant**. . .* "

(all capitalization, emphasis, punctuation, and quotations in original; alterations in original except footnote added). The complaint additionally states:

The RAR[24] in support of the proposed FBAR assessment against Mrs. Jones stated that "[t]here is no available evidence that Mrs. Jones knew about FBAR filing requirements," but concludes that "the foreign account balances and foreign income were clearly significant enough that the risk of harm for NOT making these disclosures was either known or so obvious that it should have been known."

(capitalization in original; alterations in original except footnote added).

Count One of the complaint further asserts:

The IRS made an offer to Mrs. Jones, she accepted the offer and paid the IRS consideration of $156,795.26 along with signing a verified statement of non-willfulness. The government then breached the contract by assessing FBAR penalties under a "willful blindness" theory, far above the 5% MOP agreed to penalty amount.

Plaintiffs allege that "the government breached the terms of their own contract by later asserting" that "Mrs. Jones's good faith misunderstanding of the law . . . was irrelevant," to the alleged contract, when the IRS nonetheless found Mrs. Jones' actions "willful." At times, plaintiffs' complaint in this court also appears to conflate and combine the willful FBAR penalty assessed against Mr. Jones and the willful FBAR penalty assessed against Mrs. Jones, as when the complaint states that "the IRS breached the terms of their contract not to assert other penalties which they did, in a total amount of $3,411,984," an amount which appears to reflect the addition of Mr. Jones' $1,890,074.00 willful FBAR penalty to Mrs. Jones' $1,521,940.00 willful FBAR penalty. Plaintiffs' complaint states the combined value of the two willful FBAR penalties as $3,411,984.

which was assessed with respect to tax year 2011, or the willful FBAR penalty assessed against Mrs. Jones, which was assessed with respect to the tax years 2011 and 2012.

24 As noted above, "Revenue Agent Report" or "RAR" is plaintiffs' designation for the Forms 886-A which accompanied the assessment letters sent to Mr. and Mrs. Jones and which set forth the IRS' determinations of willfulness with respect to Mr. and Mrs. Jones.

Plaintiffs' complaint, however, misstates the amount of the willful FBAR penalty assessed against Mrs. Jones as "$1,521,910," when the actual amount of the willful FBAR penalty indicated on the Form 886-A for Mrs. Jones, discussed above, was $1,521,940.00, a difference of thirty dollars. An addition of the willful FBAR penalties as provided on the Forms 886-A, $1,890,074.00 for Mr. Jones and $1,521,940.00 for Mrs. Jones, yields a total of $3,412,014.00. To add further confusion, while the figure $3,411,984.00 appears in the complaint in reference to the "other penalties" the government assessed in the alleged breach of the contract in the current suit filed in this court, plaintiffs have sought only to recover $156,795.26, as noted above, the amount of the Miscellaneous Offshore Penalty paid by Mrs. Jones only in her individual capacity. Similarly, in plaintiffs' complaint, plaintiffs refer to multiple "penalties" rather than a single "penalty" when discussing the government's alleged breach of contract, as when the complaint states that the government "breached the contract by assessing FBAR penalties" for willfulness. Plaintiffs' complaint also states that the government had argued in prior proceedings that "the only requirement was not whether Mrs. Jones (or her late husband) had '. . . *a good-faith misunderstanding of the requirements of the law,*'" (emphasis and punctuation in original), even though Mrs. Jones did not enter into the Streamlined Procedures on behalf of the estate of Mr. Jones. As noted above, the text of Form 14654, which Mrs. Jones signed, refers only to herself and states: "I recognize that if the Internal Revenue Service receives or discovers evidence of willfulness, fraud, or criminal conduct, it may open an examination or investigation that could lead to civil fraud penalties, FBAR penalties, information return penalties, or even referral to Criminal Investigation."

Defendant argues in its motion to dismiss, "the IRS opened an examination of Mrs. Jones's income tax and FBAR compliance and asserted willful penalties. Because the IRS took action that, by the express terms of the Form 14654, it was permitted to do, the IRS did not breach the purported contract." As to any possible breach in this case, defendant further argues that "[t]he IRS's evidence and analysis provides a prima facie basis for the imposition of the willful FBAR penalty based on reckless disregard," such that the government could not have breached its purported obligations under the contract alleged by plaintiffs because such penalties were contemplated by the contract's terms. Plaintiffs, however, allege that the IRS's assessment of willful FBAR penalties was not based on sufficient evidence to demonstrate "willfulness, fraud, or criminal conduct" on the part of Mr. and Mrs. Jones. Regardless, with respect to these arguments offered by defendant in its motion to dismiss, the plaintiffs' allegations of a breach of contract do not come into consideration in this case because, as concluded above, no contract came into existence. Nonetheless, to finally speak to the issue of willfulness on the part of Mr. and Mrs. Jones after four lawsuits regarding their tax liabilities regarding their foreign bank accounts, the court briefly addresses the willfulness issues surrounding Mrs. Jones' actions. The court notes, as to the issue of whether the IRS was correct in its determination that Mrs. Jones was willful in her failure to file FBARs, according to the publicly available Opinions of the California District Court ruling on the parties' cross-motions for summary judgment in the California District Court case with respect to Mrs. Jones, this is the second time that a challenge has been initiated to the determination of Mrs. Jones' willfulness. See Jones v. United States, 2020 WL 2803353, at *6 ("Mrs. Jones argues that the IRS wrongfully determined that Mrs. Jones acted willfully and argues that

willfulness requires a 'voluntary, intentional violation of a known legal duty' or conscious effort to avoid learning about FBAR requirements."). Plaintiffs, however, argue that the California Federal District Court "never reached a conclusion on willfulness in this prior case."

In defendant's reply brief in support of its motion to dismiss the current case in this court, more importantly, defendant argues:

> At all events, plaintiffs cannot now contest the IRS determination that Mrs. Jones acted recklessly or with willful blindness in failing to file FBARs. Mrs. Jones had the opportunity to litigate her willfulness in the district court case. Instead, she decided to pay a $1.3 million FBAR penalty to settle the district court case. (Pls.' Resp. at 6.) Her opportunity to contest whether the IRS was justified in asserting the willful FBAR penalty for her reckless disregard of her obligation to file the FBAR expired when she agreed to settle the district court case.

(footnote omitted).

The background regarding the issue of the IRS's determination that Mrs. Jones had acted willfully when she failed to disclose her own and her husband's foreign bank account income, starts with the Bank Secrecy Act. See 31 U.S.C. §§ 5314, 5321(a)(5)(C)-(D) (2018). The Bank Secrecy Act requires the submission of foreign account reports, but "does not define the term willful" for failure to disclose. See Landa v. United States, 153 Fed. Cl. at 597. The regulation under which FBAR penalties are assessed similarly does not define "willfulness." See 31 C.F.R. § 1010.350 (2018). Instructive, however, are the comments of the United States Supreme Court in Safeco Insurance Company of America v. Burr, 551 U.S. 47 (2007), explaining the use of the term "willfully" in certain other contexts:

> We have said before that "willfully" is a "word of many meanings whose construction is often dependent on the context in which it appears," Bryan v. United States, 524 U.S. 184, 191, 118 S. Ct. 1939, 141 L. Ed. 2d 197 (1998) (internal quotation marks omitted); and where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well, see McLaughlin v. Richland Shoe Co., 486 U.S. 128, 132–133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988) ("willful," as used in a limitation provision for actions under the Fair Labor Standards Act, covers claims of reckless violation); Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 125–126, 105 S. Ct. 613, 83 L. Ed. 2d 523 (1985) (same, as to a liquidated damages provision of the Age Discrimination in Employment Act of 1967); cf. United States v. Illinois Central R. Co., 303 U.S. 239, 242–243, 58 S. Ct. 533, 82 L. Ed. 773 (1938) ("willfully," as used in a civil penalty provision, includes "'conduct marked by careless disregard whether or not one has the right so to act'" (quoting United States v. Murdock, 290 U.S. 389, 395, 54 S. Ct. 223,

78 L. Ed. 381 (1933))). This construction reflects common law usage, which treated actions in "reckless disregard" of the law as "willful" violations. See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 34, p. 212 (5th ed. 1984) (hereinafter Prosser and Keeton) ("Although efforts have been made to distinguish" the terms "willful," "wanton," and "reckless," "such distinctions have consistently been ignored, and the three terms have been treated as meaning the same thing, or at least as coming out at the same legal exit"). The standard civil usage thus counsels reading the phrase "willfully fails to comply" in [15 U.S.C.] § 1681n(a) as reaching reckless FCRA [Fair Credit Reporting Act] violations, and this is so both on the interpretive assumption that Congress knows how we construe statutes and expects us to run true to form, see Commissioner v. Keystone Consol. Industries, Inc., 508 U.S. 152, 159, 113 S. Ct. 2006, 124 L. Ed. 2d 71 (1993), and under the general rule that a common law term in a statute comes with a common law meaning, absent anything pointing another way, Beck v. Prupis, 529 U.S. 494, 500–501, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000).

Safeco Ins. Co. of Am. v. Burr, 551 U.S. at 57-58. While the Supreme Court's decision in Safeco Insurance was not made in the context of tax law, the common law definition of "willfulness" articulated in Safeco Insurance has been relied upon previously by judges of the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims when evaluating FBAR penalties assessed for "willfulness." See, e.g., Norman v. United States, 942 F.3d 1111, 1115 (Fed. Cir. 2019) (holding "that willfulness in the context of [31 U.S.C.] § 5321(a)(5)(C) includes recklessness") (citing Bedrosian v. United States, 912 F.3d at 152-53, and United States v. Williams, 489 F. App'x 655, 658-59 (4th Cir. 2012)); Landa v. United States, 153 Fed. Cl. at 597; Kimble v. United States, 141 Fed. Cl. 373, 385 (2018); Norman v. United States, 138 Fed. Cl. 189, 191-92 (2018). The Federal Circuit stated, in a footnote in Kimble v. United States, that the taxpayer's

> reasons for the violation (her subjective belief about the need for secrecy, advice from her ex-husband, etc.) do not alter our inquiry. A taxpayer can be "willful" even if her violation has good reason. See Bedrosian v. United States, 912 F.3d 144, 153 (3d Cir. 2018) (inquiring into "subjective motivations and the overall 'egregiousness' of [the taxpayer's] conduct . . . is not required to establish willfulness in this context"); Norman, 942 F.3d at 1116 ("Actions can be willful even if taken on the advice of another."). And there is no "reasonable cause" exception for willful violations. 31 U.S.C. § 5321(a)(5)(C)(ii).

Kimble v. United States, 991 F.3d 1238, 1243 n.2 (Fed. Cir. 2021).

Applying the definition of "willfulness" expressed in Safeco Insurance, which includes the concept of recklessness, to evaluate an assessment of willful FBAR penalties by the IRS, the Federal Circuit in Kimble v. United States determined that when a taxpayer "knew about the numbered [foreign] account and took efforts to keep it secret by, among

other things, not disclosing the account to her accountant," those facts would support a determination of willfulness. Kimble v. United States, 991 F.3d at 1243 (alteration added). The Federal Circuit in Norman v. United States stated that a determination of willfulness does not "require[] a showing of actual knowledge of the obligation to file an FBAR," but "an FBAR violation would generally not be willful where a taxpayer did not know about, and had no reason to know about, her overseas account." Norman v. United States, 942 F.3d at 1115. The Federal Circuit in Norman further found willfulness when a taxpayer "signed her 2007 tax return under penalty of perjury, and this return falsely indicated that she had no interest in any foreign bank account," despite questions from her accountant "that specifically asked whether she had a foreign bank account." Id. at 1116. The Federal Circuit in Norman found this behavior, in addition to certain actions "which had the effect of inhibiting disclosure of the account to the IRS," such as opening the "foreign account as a 'numbered account,'" "preventing UBS [a foreign bank] from investing in U.S. securities on her behalf," and receiving money withdrawn in cash, evidence of willfulness. Id. (alteration added). The Federal Circuit in Norman also considered evidence of willfulness to be the taxpayer's "false statements to the IRS about her knowledge of, and the circumstances surrounding, the account." Id.

More recent cases issued by judges of the United States Court of Federal Claims also have considered failure to disclose the existence of a foreign account to one's accountant as grounds for a determination of willfulness. The judge in Landa v. United States found willfulness when the taxpayer "failed to disclose this foreign account to his accountant and never asked his accountant how to report the income from the foreign account," which led to filing a tax return that did not reflect the foreign account. Landa v. United States, 153 Fed. Cl. at 597. The judge in Kimble v. United States found the taxpayer showed "reckless disregard," and therefore, "'willful[ness],'" when the taxpayer "did not review her individual income tax returns for accuracy" and "falsely represent[ed] under penalty of perjury, that she had no foreign bank accounts." Kimble v. United States, 141 Fed. Cl. at 386 (alteration added).

While plaintiffs maintain that Mrs. Jones did not have knowledge about the reporting requirements on foreign income or the attendant tax liabilities, pursuant to the applicable law of the Federal Circuit, Mrs. Jones' ignorance of her foreign account reporting requirements does not counteract her responsibilities or liabilities under the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., and implementing regulations, see, e.g., 31 C.F.R. §§ 1010.306, 1010.350. See Norman v. United States, 942 F.3d at 1115. According to plaintiffs' complaint and attached documents, including the Proposed Statement of Uncontroverted Facts from Mrs. Jones' earlier suit challenging Mr. Jones' willful FBAR penalty, Jones v. United States, Case No. 19-00173, which was attached to plaintiffs' complaint in the above captioned case, there is no dispute that in the time period covered by the IRS's willfulness determination, the tax years 2011 and 2012, Mrs. Jones possessed foreign financial accounts. Specifically, as enumerated in the Proposed Statement of Uncontroverted Facts, Mrs. Jones owned two Canadian accounts and one New Zealand account in her name alone, and one Canadian account and three New Zealand accounts jointly with her husband. Further, plaintiffs' complaint states that Mrs. Jones, in her amended tax returns, "acknowledg[ed] the ownership of foreign accounts."

In addition to the complaint and documents attached thereto, on a motion to dismiss for failure to state a claim the court also considers documents which are referenced in the complaint, see Bell/Heery v. United States, 106 Fed. Cl. 300, 301-07 (2012), aff'd, 739 F.3d 1324 (Fed. Cir. 2014), or which are "integral to" plaintiffs' claim. See Dimare Fresh, Inc. v. United States, 808 F.3d 1301, 1306 (Fed. Cir. 2014). Specifically, the court considers the representations made by Mrs. Jones as set forth in the Attachments A and B to the Form 14654 which, while not attached to the complaint, are "expressly linked to" plaintiffs' claims, because Attachments A and B were filed with the Form 14654 in Mrs. Jones' submission to the Streamlined Procedures, and Form 14654 is frequently referenced by both plaintiffs and defendant in the current proceedings. Moreover, plaintiffs have not contested the validity of the facts contained in Attachments A and B. See Bell/Heery v. United States, 106 Fed. Cl. at 308. In her Attachment A to the Form 14654, Mrs. Jones detailed the account balances of her foreign accounts between 2008 and 2013. In her Attachment B to the Form 14654, Mrs. Jones specifically stated that "[p]rior to his death, my husband added me as a joint owner of some of his New Zealand accounts," and that "I separately established savings accounts in Canada many decades ago, when I was living in Canada." These facts support a finding that not only did Mrs. Jones own, by herself or jointly with her husband, foreign bank accounts, Mrs. Jones also knew of the accounts before her entry into the Streamlined Procedures. The Attachment B also states that "[m]y husband and I had been jointly filing U.S. federal income tax returns for the last several years, but we never reported the interest income generated by the Bank Accounts on those returns," and that "[n]either my husband nor I filed Treasury Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts reporting our interests in the Bank Accounts" before 2013. The Attachment B to the Form 14654 further states that the Joneses' accountant, Mr. Burke, "never asked the two of us if we had assets in either of our native countries of New Zealand or Canada," nor "if we had foreign accounts that would need to be reported," and "[n]one of the U.S. tax return preparers of my husband and I ever advised us of the requirements" of FBAR reporting. These facts support the conclusion that, not only did Mrs. Jones own foreign accounts, she failed to disclose those accounts to her tax return preparer and failed to disclose those accounts to the IRS when she filed the tax returns. From these facts, the court concludes that Mrs. Jones represented to the IRS on her tax returns "that she had no interest in any foreign bank account" prior to filing her amended returns following the death of Mr. Jones. Norman v. United States, 942 F.3d at 1116. By failing to disclose to the IRS the existence of the foreign accounts in her prior tax returns, of which the record before the court indicates Mrs. Jones was aware, Mrs. Jones "falsely represent[ed] under penalty of perjury, that she had no foreign bank accounts." Kimble v. United States, 141 Fed. Cl. at 386. The law of this Circuit, which, as demonstrated above, understands "willfulness" in the context of FBAR penalties to include "recklessness," classifies Mrs. Jones' failure to inform her accountant of her foreign accounts, and her failure to include those foreign accounts on her prior tax returns, as "willful" violations of the Bank Secrecy Act and the regulations promulgated pursuant thereto. See id. Accordingly, the court finds the IRS's determination of willfulness with respect to Mrs. Jones, and the accompanying assessment of willful FBAR penalties against Mrs. Jones, to be supported at this time by the available evidence. Therefore, given the facts presented to the court, plaintiffs would

not appear to have grounds to allege a breach of contract, even if a contract had come into existence, which the court has held did not.

### Count II – The Exaction Claim[25]

As indicated above, defendant also argues that this court lacks subject matter jurisdiction over plaintiffs' Count Two for illegal exaction, "because plaintiffs have failed to file a claim for refund of the Miscellaneous Offshore Penalty with the IRS." Defendant argues that

> [t]his Court lacks jurisdiction over plaintiffs' illegal exaction claims because, as discussed herein, this case is fundamentally a tax refund suit that can only be brought under I.R.C. [Internal Revenue Code, 26 U.S.C.] § 7422, and plaintiffs have failed to comply with the jurisdictional prerequisites to file a tax refund suit.

(citing United States v. Clintwood Elkhorn Min. Co., 553 U.S. 1, 12 (2008)) (alteration added).[26]

_____

[25] The court notes that the illegal exaction claim in plaintiffs' complaint is different from the illegal exaction claims brought in the California Federal District Court cases. The cases in the California Federal District Court concerned illegal exaction claims that challenged the IRS's willfulness determinations of Mr. Jones and Mrs. Jones and sought the return of the partial payments made against the willful FBAR penalties. The illegal exaction claim in plaintiffs' Count Two in the above captioned case is concerned only with the statutory basis (or lack thereof) for the Miscellaneous Offshore Penalty Mrs. Jones paid. Therefore, the illegal exaction claim in Count Two concerns a different penalty, seeks a different recovery, and asserts a different theory from what was previously litigated in the California District Court cases.

[26] Defendant, in its supplemental brief, also argues for the first time that, "if the Court determines that it has subject matter jurisdiction over plaintiffs' illegal exaction claim or that Form 14654 constituted a contract between Mrs. Jones and the United States," then "the doctrines of waiver and accord and satisfaction may apply" to bar Mrs. Jones' suit in the above captioned case to recover the Miscellaneous Offshore Penalty. According to defendant, "[t]he settlement documents" from Mrs. Jones' prior settlement agreement with the government, which resolved the willful FBAR penalties owed by Mr. and Mrs. Jones and concluded the California Federal District Court cases, "indicate that the parties [to the prior suits] intended that Mrs. Jones would waive any right to recover the MOP in a separate suit—that is, she [Mrs. Jones] waived the right to prosecute the present suit" in the above captioned case. (alterations added). Defendant indicates, however, that further discovery and "a more developed factual record," including "[t]estimony of the individuals involved in the settlement of the California cases" "would be helpful in resolving these defenses." Plaintiffs' response to defendant's arguments for the applicability of the doctrines of waiver and accord and satisfaction is to assert that "Mrs. Jones never settled, waived or conceded the $156,795.26 streamline payment

"Subject-matter jurisdiction may be challenged at any time by the parties or by the court sua sponte." Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (quoting Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); see also St. Bernard Parish Gov't v. United States, 916 F.3d 987, 992-93 (Fed. Cir. 2019) ("[T]he court must address jurisdictional issues, even sua sponte, whenever those issues come to the court's attention, whether raised by a party or not, and even if the parties affirmatively urge the court to exercise jurisdiction over the case." (citing Foster v. Chatman, 136 S. Ct. 1737, 1745 (2016)); Int'l Elec. Tech. Corp. v. Hughes Aircraft Co., 476 F.3d 1329, 1330 (Fed. Cir. 2007); Haddad v. United States, 152 Fed. Cl. 1, 16 (2021); Fanelli v. United States, 146 Fed. Cl. 462, 466 (2020). The Tucker Act, 28 U.S.C. § 1491 (2018), grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289-90 (2009); see also Me. Community Health Options v. United States, 140 S. Ct. 1308, 1327-28 (2020); United States v. Mitchell, 463 U.S. 206, 216 (1983); Sanford Health Plan v. United States, 969 F.3d 1370, 1378 (Fed. Cir. 2020); Alvarado Hosp., LLC v. Price, 868 F.3d 983, 991 (Fed. Cir. 2017); Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999); Gulley v. United States, 150 Fed. Cl. 405, 411 (2020); Kuntz v. United States, 141 Fed. Cl. 713, 717 (2019). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The Ontario Power Generation, Inc. court wrote:

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver . . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the

_____

previously made which is the economic issue at stake in this case," and to reiterate, later in plaintiffs' supplemental brief, that "[a]t no time however, did Mrs. Jones or her counsel waive her right to seek a refund for the illegal exaction of the $156,795 here at issue."

Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605-06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S. [392,] 401-02 [(1976)] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ont. Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Samish Indian Nation v. United States, 419 F.3d at 1364; Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

As the Federal Circuit has explained, "[a]llegations of subject matter jurisdiction, to suffice, must satisfy a relatively low standard—must exceed a threshold that 'has been equated with such concepts as "essentially frivolous," "wholly insubstantial," "obviously frivolous," and "obviously without merit."'" Boeing Co. v. United States, 968 F.3d 1371, 1383 (Fed. Cir. 2020) (quoting Shapiro v. McManus, 136 S. Ct. 450, 456 (2015)). Accordingly, "to establish Tucker Act jurisdiction for an illegal exaction claim, a party that has paid money over to the government and seeks its return must make a non-frivolous allegation that the government, in obtaining the money, has violated the Constitution, a statute, or a regulation." Id.; see also Gulley v. United States, 150 Fed. Cl. at 418; Ohio v. United States, 150 Fed. Cl. 173, 180 (2020); Perry v. United States, 149 Fed. Cl. 1, 13 (2020), aff'd 2021 WL 2935075 (Fed. Cir. 2021).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 9-10 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). A plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of

the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2); Fed. R. Civ. P. 8(a)(1), (2) (2022); see also Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57, 570 (2007)). To properly state a claim for relief, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. WRIGHT AND A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1286 (3d ed. 2004)); "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014); see also Hale v. United States, 143 Fed. Cl. 180, 190 (2019). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

In Count Two of plaintiffs' complaint, plaintiffs assert an illegal exaction claim in which they argue that, because the Miscellaneous Offshore Penalty is not authorized by any statute, the IRS had no authority to collect the Miscellaneous Offshore Penalty and Mrs. Jones' Miscellaneous Offshore Penalty payment must be returned to the executors of her estate. Throughout plaintiffs' complaint, plaintiffs describe the Miscellaneous Offshore Penalty as "hav[ing] no statutory authority," as "not exist[ing] in the law," as "in contravention of statutes of the United States," as "without any authority in the law or any statute," and as being "nowhere to be found in any statute, not in Title 26 or Title 31." These descriptions indicate that plaintiffs argue that the Miscellaneous Offshore Penalty paid by Mrs. Jones was "collected without authority" or was "in any manner wrongfully collected," per I.R.C. § 7422(a) (2018). The United States Court of Appeals for the Federal Circuit in Norman v. United States has indicated that

[a]n "illegal exaction," as that term is generally used, involves money that was "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." Eastport S.S. Corp. v. United States, 178 Ct. Cl. 599, 372 F.2d 1002, 1007 (1967). The classic illegal exaction claim is a tax refund suit alleging that taxes have been improperly collected or withheld by the government. See, e.g., City of Alexandria v. United States, 737 F.2d 1022, 1028 (Fed. Cir. 1984). An illegal exaction involves a deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment to the Constitution. See, e.g., Casa de Cambio Comdiv [S.A. de C.V. v. United States], 291 F.3d [1356,] 1363 [(Fed. Cir. 2002)]. The Court of Federal Claims ordinarily lacks jurisdiction over due process claims under the Tucker Act, 28 U.S.C. § 1491, see Murray v. United States, 817 F.2d 1580, 1582 (Fed. Cir. 1987), but has been held to have jurisdiction over illegal exaction claims "when the exaction is based upon an asserted statutory power." Aerolineas Argentinas v. United States, 77 F.3d 1564, 1573 (Fed. Cir. 1996); see also Eastport [S.S. Corp. v. United States], 372 F.2d at 1008 (Court of Claims had

jurisdiction over exaction "based upon a power supposedly conferred by a statute"). To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by "necessary implication," that "the remedy for its violation entails a return of money unlawfully exacted." Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000) (concluding that the Tucker Act provided jurisdiction over an illegal exaction claim based upon the Export Clause of the Constitution because the language of that clause "leads to the ineluctable conclusion that the clause provides a cause of action with a monetary remedy").

Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005) cert. denied, 547 U.S. 1147 (2006); see also Columbus Reg'l Hosp. v. United States, 990 F.3d at 1348 ("An illegal exaction occurs when the plaintiff has paid money to the government and seeks return of the money that was 'improperly . . . taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" (quoting Virgin Islands Port Auth. v. United States, 922 F.3d 1328, 1333 (Fed. Cir. 2019))); Christy, Inc. v. United States, 971 F.3d 1332, 1336 (Fed. Cir. 2020), cert. denied, 141 S. Ct. 1393 (2021); Nat'l Veterans Legal Servs. Program v. United States, 968 F.3d 1340, 1348 (Fed. Cir. 2020). "The essence of an illegal exaction is when 'the government has the citizen's money in its pocket.'" Columbus Reg'l Hosp. v. United States, 990 F.3d at 1348 (quoting Nat'l Veterans Legal Servs. Program v. United States, 968 F.3d at 1348). The Federal Circuit has explained that "a plaintiff has a claim for an illegal exaction only where the government has direct and substantial impact on the plaintiff asserting the claim." Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d 1356, 1364 (Fed. Cir. 2002), cert. denied, 538 U.S. 921 (2003); see also Ont. Power Generation, Inc. v. United States, 369 F.3d at 1303 ("[T]he government is considered to have illegally exacted money from a plaintiff only where 'the government's actions on the intermediate third party have a "direct and substantial" impact on the plaintiff asserting the [illegal exaction] claim.'" (quoting Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d at 1361) (alteration in original)). Another judge of the United States Court of Federal Claims has explained that "[a]n illegal exaction may be brought where '(1) money was taken [from the plaintiff] by the government and (2) the exaction violated a provision of the Constitution, a statute, or a regulation.'" M Nicolas Enters., LLC v. United States, 155 Fed. Cl. 608, 619 (2021) (alterations in original except "[a]n") (quoting Piszel v. United States, 121 Fed. Cl. 793, 801 (2015), aff'd 833 F.3d 1366 (Fed. Cir. 2016), cert. denied, 138 S. Ct. 85 (2017)); see also Pate v. United States, 152 Fed. Cl. 553, 557 (2021) (explaining that "[t]o prove that the VA's collections were an illegal exaction," plaintiff "must show that the money 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" (quoting Aerolineas Argentinas v. United States, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (internal quotations omitted), reh'g denied and en banc suggestion declined (1996))). "For actions pursuant to contracts with the United States, actions to recover illegal exactions of money by the United States, and actions brought pursuant to money-mandating statutes, regulations, executive orders, or constitutional provisions, the Tucker Act waives the sovereign immunity of the United States." Roth v. United States, 378 F.3d 1371, 1384 (Fed. Cir. 2004); see also Ont. Power Generation, Inc. v. United States, 369 F.3d at 1301.

Regarding jurisdiction in illegal exaction claims,

in contrast to other actions for money damages, jurisdiction exists under the Tucker Act "even when the Constitutional provision allegedly violated does not contain compensation mandating language." Casa de Cambio Comdiv S.A. de C.V. v. United States, 48 Fed. Cl. 137, 143-48 (2000) (citing Bowman v. United States, 35 Fed. Cl. 397, 401 (1996), and holding "that this court has jurisdiction to consider whether the alleged violation of the regulations led to an illegal exaction violative of the Due Process Clause, despite the fact that clause does not contain compensation mandating language"), aff'd, 291 F.3d 1356, 1363 (Fed. Cir. 2002) ("Our cases have established that there is no jurisdiction under the Tucker Act over a Due Process claim *unless* it constitutes an illegal exaction." (emphasis added) (citing Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987), cert. denied, 489 U.S. 1055, 109 S. Ct. 1318, 103 L. Ed. 2d 587 (1989), and Inupiat Comy. of the Arctic Slope v. United States, 230 Ct. Cl. 646, 662, 680 F.2d 122, cert. denied 459 U.S. 969, 103 S. Ct. 299, 74 L. Ed. 2d 281 (1982).

Perry v. United States, 149 Fed. Cl. at 25; see also Boeing Co. v. United States, 968 F.3d at 1384; Casa de Cambio Comdiv S.A., de C.V. v. United States, 291 F.3d at 1363; Aerolineas Argentinas v. United States, 77 F.3d at 1572 ("Tucker Act claims may be made for recovery of monies that the government has required to be paid contrary to law."); Thomas v. United States, 155 Fed. Cl. 772, 776 (2021) ("Unlike other types of claims in this Court, with an illegal exaction claim, '[j]urisdiction exists even when the provisions allegedly violated do not contain money-mandating language.'" (alteration in original) (quoting Bernaugh v. United States, 38 Fed. Cl. 538, 543 (1997), aff'd 168 F.3d 1319 (Fed. Cir. 1998))); Mendu v. United States, 153 Fed. Cl. 357, 364 (2021) ("'The refund of a penalty improperly exacted pursuant to an Act of Congress is a substantive right for money damages' and constitutes an illegal exaction claim under the Tucker Act." (quoting Trayco, Inc. v. United States, 994 F.2d 832, 837 (Fed. Cir. 1993))); Acadiana Mgmt. Grp., LLC v. United States, 151 Fed. Cl. 121, 129-30 (2020), recons. denied, (2021), appeal filed, No. 21-1941; Ohio v. United States, 150 Fed. Cl. 173, 180-81 (2020); Gulley v. United States, 150 Fed. Cl. at 415 (explaining that "for a statutory or constitutional provision to serve as the basis for a claim within this Court's jurisdiction, the provision must either be money-mandating or support a claim for an illegal exaction"); Allegheny Techs. Inc. v. United States, 144 Fed. Cl. 126, 136 (2019) ("An exaction claim provides an independent basis for jurisdiction and is a type of claim that the Tucker Act and the Little Tucker Act were designed to address."); Virgin Islands Port Auth. v. United States, 136 Fed. Cl. 7, 14 (2017) ("Plaintiff need not point to a money-mandating provision, because the necessary remedy to the government improperly using its authority to place 'a citizen's money in its pocket' is a return of that sum.") aff'd 922 F.3d 1328 (Fed. Cir. 2019).

Defendant argues that "this Court lacks subject matter jurisdiction over plaintiffs'" Count Two claim for illegal exaction, "because plaintiffs have failed to file a claim for refund with the IRS" before bringing suit in this court, which is required in a tax refund

suit. According to defendant, "[t]he MOP is a Title 26 penalty paid in lieu of other penalties under the internal revenue laws." Further, according to defendant,

> [w]hereas the IRS could have assessed taxes for earlier years, civil tax penalties, failure-to-pay penalties, and a litany of information return penalties, as a matter of administrative expedience, the IRS imposed the one-time MOP. In effect, the MOP is simply a substitute for other Title 26 penalties and tax loss for years prior to the disclosure period.

Defendant argues that "[b]ecause the MOP covers taxes and other penalties that are considered taxes, in similar fashion the MOP is considered a tax under the internal revenue laws." Defendant argues, however, that "[t]he Court need not resolve the issue of whether the MOP is a Title 26 penalty because [I.R.C.] § 7422(a) first requires a claim for refund to be filed with the IRS before plaintiffs can litigate the merits of their argument," which plaintiffs and Mr. and Mrs. Jones had failed to do. In their response, plaintiffs argue that "the MOP described in Form 14654, and that was paid by Mrs. Jones, is not reflected in title 26." (capitalization in original). Therefore, according to plaintiffs, "a claim for tax refund was not required to be filed prior to this procedure."

> The statute at I.R.C. § 7422(a) provides:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

I.R.C. § 7422(a) (2018). The Federal Circuit has explained that "the Supreme Court has interpreted the filing requirement in § 7422(a) as a jurisdictional limitation," in particular the requirement of "the fact of filing." Brown v. United States, 22 F.4th 1008, 1011 (Fed. Cir. 2022) (citing United States v. Dalm, 494 U.S. 596, 609-10 (1990)); see also Stephens v. United States, 884 F.3d 1151, 1156 (Fed. Cir. 2018) (holding that plaintiffs' refund suit was barred for failing to file a refund claim with the IRS); (RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009). A judge of the Court of Federal Claims has similarly explained, "section 7422(a) creates a jurisdictional prerequisite to filing a refund suit." Gluck v. United States, 84 Fed. Cl. 609, 613 (2008) (citing Chicago Milwaukee Corp. v. United States, 40 F.3d 373, 374 (Fed. Cir. 1994), reh'g and reh'g en banc denied, 141 F.3d 1112 (Fed. Cir.), cert. denied, 525 U.S. 932 (1998) (citing Burlington N., Inc. v. United States, 231 Ct. Cl. 222, 684 F.2d 866, 868 (1983))). Therefore, according to defendant, if the Miscellaneous Offshore Penalty paid by Mrs. Jones is a tax, a penalty, or a "sum alleged to have been excessive or in any manner wrongfully collected," then any suit to recover the Miscellaneous Offshore Penalty, styled as a claim for illegal exaction or otherwise, must meet the jurisdictional prerequisite of I.R.C. § 7422(a) requiring that "a claim for refund or credit has been duly filed with the Secretary" before filing with this court. I.R.C. § 7422(a).

The United States Supreme Court in <u>Flora v. United States</u>, 362 U.S. 145 (1960), considered the application of 28 U.S.C. § 1346(a)(1) (1954), a statute with nearly identical language to I.R.C. § 7422(a). The statute at 28 U.S.C. § 1346(a)(1), as enacted at the time of <u>Flora</u>, provided concurrent jurisdiction over

> [a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws

28 U.S.C. § 1346(a)(1) (1954), to the Court of Claims and to the United States District Courts. <u>See</u> <u>Flora v. United States</u>, 362 U.S. at 148-49. The Supreme Court described the "any sum" language as "a catchall" which should be interpreted according to a "disjunctive reading" in relation to the "internal-revenue tax" and "penalty" language. <u>Id.</u> at 149. The Supreme Court in <u>Flora</u> held that

> 'any sum,' instead of being related to 'any internal-revenue tax' and 'any penalty,' may refer to amounts which are neither taxes nor penalties. Under this interpretation, the function of the phrase is to permit suit for recovery of items which might not be designated as either 'taxes' or 'penalties' by Congress or the courts.

<u>Id.</u> In a footnote, the Supreme Court in <u>Flora</u> further explained that the inclusion of the "any sum" language in 28 U.S.C. § 1346(a)(1) "indicates no more than an intent to cover taxes, penalties, and sums which might, strictly speaking, be neither taxes nor penalties." <u>Flora v. United States</u>, 362 U.S. at 155 n.16.[27]

In <u>United States v. Clintwood Elkhorn Mining Co.</u>, the Supreme Court elaborated on the relationship of the Internal Revenue Code to this court's jurisdiction under the Tucker Act:

> The Internal Revenue Code provides that taxpayers seeking a refund of taxes unlawfully assessed must comply with tax refund procedures set forth in the Code. Under those procedures, a taxpayer must file an administrative claim with the Internal Revenue Service before filing suit against the

---

[27] Defendant cites to <u>Flora</u>'s discussion of the "any sum" language for support that the Miscellaneous Offshore Penalty "falls within the broad language of the statute," I.R.C. § 7422(a). Plaintiffs object to this reference to <u>Flora</u> on the grounds that <u>Flora</u> "stands for the proposition that a full payment of taxes and tax penalties must be paid prior to bringing a suit for a refund," and state that "[t]he government cannot argue she [Mrs. Jones] owes additional amounts and must somehow pay those before availing herself of the claims in this court." (alteration added). There is no dispute in the current case that Mrs. Jones paid her Miscellaneous Offshore Penalty in full. Moreover, at the conclusion of the California District Court cases, the cases were settled and payment to resolve her outstanding FBAR liability was made.

Government. . . . The question in this case is whether a taxpayer suing for a refund of taxes collected in violation of the Export Clause of the Constitution may proceed under the Tucker Act, when his suit does not meet the time limits for refund actions in the Internal Revenue Code. The answer is no.

United States v. Clintwood Elkhorn Min. Co., 553 U.S. at 4. The Supreme Court in Clintwood Elkhorn further explained:

> A taxpayer seeking a refund of taxes erroneously or unlawfully assessed or collected may bring an action against the Government either in United States district court or in the United States Court of Federal Claims. 28 U.S.C. § 1346(a)(1); EC Term of Years Trust v. United States, 550 U.S. 429, 432, and n. 2, 127 S. Ct. 1763, 1766 n. 2, 167 L. Ed. 2d 729 (2007). The Internal Revenue Code specifies that before doing so, the taxpayer must comply with the tax refund scheme established in the Code. United States v. Dalm, 494 U.S. 596, 609-10, 110 S. Ct. 1361, 108 L. Ed 2d 548 (1990). That scheme provides that a claim for a refund must be filed with the Internal Revenue Service (IRS) before suit can be brought, and establishes strict timeframes for filing such a claim.

United States v. Clintwood Elkhorn Min. Co., 553 U.S. at 4. The Supreme Court continued and elaborated further on the meaning of I.R.C. § 7422(a):

> Title 26 U.S.C. § 7422(a) states that "*[n]o suit* . . . shall be maintained in *any court* for the recovery of *any internal revenue tax* alleged to have been erroneously or illegally assessed or collected, or of *any penalty* claimed to have been collected without authority, or of *any sum* alleged to have been excessive or *in any manner* wrongfully collected, until a claim for refund . . . has been duly filed with" the IRS. (Emphasis added.) Here the companies did not file a refund claim with the IRS for the 1994-1996 taxes, and therefore may bring "[n]o suit in "any court" to recover "any internal revenue tax" or "any sum" alleged to have been wrongfully collected "in any manner." Five "any's" in one sentence and it begins to seem that Congress meant the statute to have expansive reach.

United States v. Clintwood Elkhorn Min. Co., 553 U.S. at 7 (emphasis and alterations in original). While the Clintwood Elkhorn Court's analysis was focused on a relatively narrow question of whether the six-year statute of limitations under the Tucker Act applied to a tax refund suit that otherwise would have been subject to a shorter, two- to three-year time bar under I.R.C. § 6511(a), United States v. Clintwood Elkhorn Mining Co., 553 U.S. at 4-5, the principles underlying the Supreme Court's holding are instructive. The Supreme Court in Clintwood Elkhorn reasoned, "[t]he refund scheme in the current Code would have 'no meaning whatever' if taxpayers failing to comply with it were nonetheless allowed to bring suit subject only to the Tucker Act's longer time bar," and that "Congress has the authority to require administrative exhaustion before allowing a suit against the Government, even for a constitutional violation." Id. at 9. Further, "it is certainly within

Congress's authority to ensure that allegations of taxes unlawfully assessed—whether the asserted illegality is based upon the Export Clause or any other provision of law—are processed in an orderly and timely manner, and that costly litigation is avoided when possible." Id. at 12. Given that I.R.C. § 7422(a), by its terms, subjects not only actions "for the recovery of any internal revenue tax" or for the recovery "of any penalty" to its jurisdictional prerequisite, but also actions for the recovery "of any sum," any challenge to the previously collected sums by the IRS, whether styled as a claim for refund or for illegal exaction, included in plaintiffs' Count Two claim, would seem to be subject to the restrictions in I.R.C. § 7422(a) as a jurisdictional prerequisite. See Alexander Proudfoot Co. v. United States, 197 Ct. Cl. 219, 223 and n.2 (1972) (referring to I.R.C. § 7422(a)'s[28] "all-inclusive words" and stating that "[i]f the interest sought here is not included in 'any internal revenue tax alleged to have been erroneously or illegally assessed or collected,' then it is covered by 'any sum alleged to have been excessive or in any many wrongfully collected'").

In order to try to argue that the Miscellaneous Offshore Penalty is neither a tax nor a penalty under the Internal Revenue Code, plaintiffs cite to various subchapters and sections of the Internal Revenue Code, although with little explanation. Plaintiffs' unifying theme appears to be that none of the sections which relate to taxes or penalties apply to or cover the Miscellaneous Offshore Penalty. Plaintiffs quote from various sections of the Internal Revenue Code, such as I.R.C. §§ 6511, 6671, and 6751, and seize upon mentions of the words "tax" and "penalty," along with conclusory statements such as "[h]ere, we have no *tax* that was paid," (emphasis in original), with otherwise sparse reasoning, in an apparent attempt to illustrate that the Miscellaneous Offshore Penalty paid by Mrs. Jones "is not a tax or penalty in the statute." The statutory provisions cited by plaintiffs are neither at issue in the case currently before the court, nor are they dispositive of the issue that is before the court, whether the language of I.R.C. § 7422(a) subjects plaintiffs' claim to a jurisdictional requirement to bring a refund claim to the IRS before filing suit in this court.

While defendant does not contend that the Miscellaneous Offshore Penalty is referenced in Title 26, defendant characterizes the Miscellaneous Offshore Penalty as "a penalty assessed and collected under the internal revenue laws (Title 26 of the U.S.

---

[28] The United States Court of Claims in Alexander Proudfoot Co. explained the application of I.R.C. § 7422(a):

Section 7422(a), 26 U.S.C. § 7422(a), forbids, in all-inclusive words, any suit "for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected," until a proper refund or credit claim has been filed.

Alexander Proudfoot Co. v. United States, 197 Ct. Cl. at 223 (quoting I.R.C. § 7422(a) (footnote omitted)).

Code) in lieu of certain other penalties." Defendant indicates in a footnote that I.R.C. § 7803(a)(2)(A)[29] gives the IRS the authority to assess the Miscellaneous Offshore Penalty. Defendant argues that

---

[29] The statute at I.R.C. § 7803 provides, in relevant part:

**(a) Commissioner of Internal Revenue.--**

**(1) Appointment.--**

**(A) In general.**--There shall be in the Department of the Treasury a Commissioner of Internal Revenue who shall be appointed by the President, by and with the advice and consent of the Senate. Such appointment shall be made from individuals who, among other qualifications, have a demonstrated ability in management.

**(B) Term.**--The term of the Commissioner of Internal Revenue shall be a 5-year term, beginning with a term to commence on November 13, 1997. Each subsequent term shall begin on the day after the date on which the previous term expires.

**(C) Vacancy.**--Any individual appointed as Commissioner of Internal Revenue during a term as defined in subparagraph (B) shall be appointed for the remainder of that term.

**(D) Removal.**--The Commissioner may be removed at the will of the President.

**(E) Reappointment.**--The Commissioner may be appointed to serve more than one term.

**(2) Duties.**--The Commissioner shall have such duties and powers as the Secretary may prescribe, including the power to—

**(A)** administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws or related statutes and tax conventions to which the United States is a party; and

**(B)** recommend to the President a candidate for appointment as Chief Counsel for the Internal Revenue Service when a vacancy occurs, and recommend to the President the removal of such Chief Counsel.

I.R.C. § 7803(a)(1)-(2) (emphasis in original).

> [u]nder § 7803(a)(2)(A), the Commissioner of Internal Revenue has the authority "to administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws." The authority to enforce a law includes the authority to refrain from taking enforcement action. _Heckler v. Chaney_, 470 U.S. 821, 831 (1985) ("[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

(alteration in original). Defendant, however, does not elaborate on this argument further in its motion to dismiss or in its reply brief. Defendant appears to be asserting that I.R.C. § 7803(a)(2)(A), as further explained by Heckler v. Chaney, 470 U.S. at 831 (explaining that the "agency's decision not to prosecute or enforce" is "committed to an agency's absolute discretion"), makes allowing participation in the Streamlined Procedures and the collection of the Miscellaneous Offshore Penalty in place of the enforcement of "certain other penalties" an option for the IRS to collect penalties, if appropriate, at the discretion of the Commissioner. Plaintiffs do not address this argument of defendant's except to provide the following response:

> The government argues that this MOP is a Title 26 penalty because of the Commissioner's authority under 26 U.S.C. §7803 to "administer, manage, conduct, direct and supervise the execution and applications [sic] of the internal revenue laws." However, this is, in contrast, to a number of the various penalties specifically identified in Title 26. Such as 26 U.S.C. §§6672, 6674, 6677, 6679, 6682, 6684, 6685, 6686, 6688, 6689, 6690, 6692, 6693, 6694, 6695, 6695A, 6702, 6704, 6705, 6707, 6707A, 6708, 6713, and 6714.

Defendant cites for support to two cases from the United States District Court for the District of Columbia, Maze v. Internal Revenue Service, 206 F. Supp. 3d 1 (D.D.C. 2016), and to Harrison v. Internal Revenue Service, No. 20-828, 2021 WL 930266 (D.D.C. Mar. 11, 2021). According to defendant,

> [a]s the District Court in _Maze_ held, the MOP "is not a new penalty that the IRS invented." _Maze_, 206 F. Supp. 3d at 14. Rather, "it is a label that the IRS developed to refer to standard payments required of taxpayers in lieu of other statutorily created penalties." _Id._ Whereas the IRS could have assessed taxes for earlier years, civil tax fraud penalties, failure-to-pay penalties, and a litany of information return penalties, as a matter of administrative expedience, the IRS imposed the one-time MOP. In effect, the MOP is simply a substitute for other Title 26 penalties and tax loss for years prior to the disclosure period. Because those other penalties are considered taxes, in similar fashion the MOP is considered a tax under the internal revenue laws. _Maze_, 206 F. Supp. 3d at 14; _see also Harrison v. IRS_, No. 20-cv-828, 2021 WL 930266, *4 (D.D.C. Mar. 11, 2021).

(footnote omitted). Moreover, defendant states that "the MOP is simply a consolidation of all taxes and other potential penalties that could have been imposed under the internal revenue laws."

While the Federal District Court for the District of Columbia in Maze and Harrison did reach the conclusion that the Miscellaneous Offshore Penalty is a tax, the District Court reached that conclusion in different contexts from the case currently before the court. The court in Maze determined the Miscellaneous Offshore Penalty was a tax in the context of finding that it was "deprived of subject matter jurisdiction over this case as a result of the Anti-Injunction Act and the tax exception to the Declaratory Judgment Act," reasons which are distinct from the issues in the case currently before the court. Maze v. Internal Revenue Serv., 206 F. Supp. 3d at 21. The court in Harrison, similarly, reached the conclusion that the Miscellaneous Offshore Penalty is a tax in the context of an Administrative Procedure Act challenge. Harrison v. Internal Revenue Serv., 2021 WL 930266, at *4. Neither the Maze nor the Harrison courts identified the specific taxes and penalties in lieu of which the Miscellaneous Offshore Penalty was assessed.

In response to plaintiffs' argument that the Miscellaneous Offshore Penalty is neither a tax nor a penalty under the Internal Revenue Code, the court notes that although the Miscellaneous Offshore Penalty may not carry an official title as a penalty, nor is there enumeration in the United States Code, the payment of the Miscellaneous Offshore Penalty by Mrs. Jones was as a payment for her failure to report and pay taxes for her foreign accounts and as a way to rectify that failure, provided it was not found to be willful. She entered the Streamlined Procedures, submitted the required information, and signed the Form 14654, all voluntarily, as a way to minimize the totality of the possible tax penalties the IRS could assess against her had she not entered into the Streamlined Procedures. Further, as noted above, on the Form 14654, as part of her certification, Mrs. Jones subscribed to the statement "I consent to the immediate assessment and collection of a Title 26 miscellaneous offshore penalty for the most recent of the three tax years for which I am providing amended income tax returns."

Moreover, the jurisdictional prerequisite of I.R.C. § 7422(a), by the statute's text, is not restricted in application only to taxes, penalties, and sums assessed under Title 26. Rather, I.R.C. § 7422(a) states that "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax . . . or of any penalty . . . or of any sum" for which there has not been an administrative claim for refund filed with the IRS. I.R.C. § 7422(a); see also United States v. Clintwood Elkhorn Mining Co., 553 U.S. at 7; Flora v. United States, 362 U.S. at 149; Alexander Proudfoot Co. v. United States, 197 Ct. Cl. at 228-29; Gluck v. United States, 84 Fed. Cl. at 613-14. Even if the court were to grant that the modifier "internal revenue" on the word "tax" indicated that section 7422(a) applies only to taxes found in Title 26, as plaintiffs appear to argue, given their focus on the argument that the Miscellaneous Offshore Penalty is not enumerated in Title 26, that would not prevent the application of section 7422(a)'s jurisdictional prerequisite to plaintiffs' claim. By its text, section 7422(a) imposes its jurisdictional prerequisite not only on claims for a "recovery of any internal revenue tax" but also on claims for a recovery "of any penalty" and "of any sum" as well. I.R.C. § 7422(a). "[I]nternal revenue" does not appear to modify "penalty" or "sum" in the statutory text. Id. Accordingly, even if "internal

revenue tax" refers only to those taxes specifically enumerated in Title 26, thereby not including the Miscellaneous Offshore Penalty paid by Mrs. Jones within the definition of "internal revenue tax," as plaintiffs argue, the question would remain as to whether the Miscellaneous Offshore Penalty was a "penalty" or "sum" otherwise covered by section 7422(a). For these reasons, plaintiffs' reliance that the Miscellaneous Offshore Penalty is not enumerated in Title 26 does not convince the court that plaintiffs' claim is not subject to the jurisdictional prerequisite of I.R.C. § 7422(a).

Plaintiffs have initiated the above captioned case by seeking "judgment in the amount of $156,795.26 having been illegally exacted from Plaintiff [sic]," and plaintiffs plead in Count Two that "the IRS must return the $156,795.26 paid by Mrs. Jones, now deceased, which was an illegal exaction and was wrongfully collected under the guise of the internal revenue laws." As noted above, I.R.C. § 7422(a) applies a jurisdictional prerequisite not only to claims "for the recovery of any internal revenue tax," but also to claims seeking to recover "any penalty claimed to have been collected without authority," and to claims seeking to recover "any sum alleged to have been excessive or in any manner wrongfully collected . . . ." I.R.C. § 7422(a). Plaintiffs' complaint refers to the above captioned case as "for 'penalty' amounts," along with repeated unqualified uses of the word "penalty" to refer to the Miscellaneous Offshore Penalty amount paid, and the Form 14654, which Mrs. Jones signed, which required Mrs. Jones to "consent to the immediate assessment and collection of a Title 26 miscellaneous offshore penalty" to enter into the Streamlined Procedures. These repeated uses of "penalty" language to refer to the amount which plaintiffs seek to recover appear to constitute an acknowledgment on the part of the executor plaintiffs, as well as by Mrs. Jones when she signed the Form 14654, that the amount at issue is and was a "penalty." Moreover, as noted above, section 7422(a) employs "all-inclusive words," Alexander Proudfoot Co. v. United States, 197 Ct. Cl. at 223, when stating that the statute covers claims for "any sum," language which by its plain terms encompasses the amount plaintiffs seek to recover. I.R.C. § 7422(a); see also Flora v. United States, 362 U.S. at 149.

The court concludes that I.R.C. § 7422(a) applies to plaintiffs' Count Two claim for illegal exaction of the Miscellaneous Offshore Penalty, and in order to proceed with their lawsuit plaintiffs first should have filed an administrative claim for a refund of the Miscellaneous Offshore Penalty with the IRS before proceeding in this court. The parties have not produced any documentation of such a claim previously initiated by plaintiffs or Mrs. Jones for a refund of the Miscellaneous Offshore Penalty. Accordingly, pursuant to I.R.C. § 7422(a) this court does not have jurisdiction to review plaintiffs' illegal exaction claim asserted by Count Two of plaintiffs' complaint.

Moreover, there is no dispute that Mrs. Jones volunteered to become part of the Streamlined Procedures and consented to the collection of the Miscellaneous Offshore Penalty. Plaintiffs' complaint states that, following Mr. Jones' death, Mrs. Jones "was advised of the SDO," plaintiffs' abbreviation for the Streamlined Procedures, "and then entered into it." Plaintiffs' complaint does not allege at any point that the IRS required Mrs. Jones to pay the Miscellaneous Offshore Penalty. In fact, plaintiffs characterize Mrs. Jones has having "accepted" the payment of the Miscellaneous Offshore Penalty in order to enter the Streamlined Procedures. In addition, the language of the Form 14654

indicates that payment of the Miscellaneous Offshore Penalty is entirely voluntary, providing: "I consent to the immediate assessment and collection of a Title 26 miscellaneous offshore penalty for the most recent of the three tax years for which I am providing amended income tax returns." Mrs. Jones accepted and subscribed to this language in the Form 14654, and plaintiffs do not now claim that Mrs. Jones' payment of the Miscellaneous Offshore Penalty was non-consensual. As explained above, claims for illegal exaction require money to have been "improperly paid, exacted, or taken from" plaintiffs. Pate v. United States, 152 Fed. Cl. at 557. In order to obtained Tucker Act jurisdiction in this court, plaintiffs must assert a claim "for recovery of monies that the government has required to be paid contrary to law." Aerolineas Argentinas v. United States, 77 F.3d at 1572.

Therefore, whether the Miscellaneous Offshore Penalty is a "penalty" or merely a "sum," the language employed in plaintiffs' complaint brings plaintiffs' claims within the coverage of I.R.C. § 7422(a). Based on the above discussion, plaintiffs' claim for illegal exaction does not fall within the jurisdiction of this court for failure to meet the jurisdictional prerequisite of I.R.C. § 7422(a), and also because of the voluntary nature of Mrs. Jones' acceptance of the Streamlined Procedures' requirements and her payment of the Miscellaneous Offshore Penalty.

## CONCLUSION

For the reasons stated above, the defendant's motion to dismiss Count One of plaintiffs' complaint for failure to state a claim and to dismiss Count Two for lack of jurisdiction is **GRANTED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**